## CONSOLIDATED GAS CO. OF NEW YORK v. PRENDERGAST et al.

(District Court, S. D. New York.    April 22, 1925.)

**1. Gas ⬅14(1)—Rate limited by statute for New York City companies held confiscatory as to plaintiff.**

Rate of $1 per 1,000 feet, prescribed by Laws N. Y. 1923, c. 899, as maximum for New York City gas companies, *held* confiscatory as to plaintiff, where return would be much less than 6 per cent., whatever rate base be the starting point.

**2. Equity ⬅410(7)—Matters in master's report, unnecessary for court's decision, not passed on.**

The propriety of the special master's exclusions of certain items in determining operating expenses of a public utility, as the cost of constantly recurring rate litigation, will not be passed on; the rate statute complained of being confiscatory, even with such items omitted.

**3. Constitutional law ⬅277(1)—Property, and not original cost, of which owner may not be deprived without due process.**

It is the property, and not the original cost, of which an owner, such as a public utility, may not be deprived without due process of law.

**4. Public service commissions ⬅7—Present value of utility's property goal of investigation for rate purposes.**

Relative to statutory rate prescribed for public utility being confiscatory, the present value of its property, expressed in terms of present money, is the goal of investigation.

**5. Public service commissions ⬅7—Reproduction cost, less depreciation, dominant element in determining rate base.**

While reproduction cost, less depreciation, is the dominant element in determining rate base for a public utility, it is not exclusive of other elements.

**6. Gas ⬅14(1)—Reasonable rate of return held 8 per cent.**

At the present time, a reasonable rate of return, according to well-recognized custom, in a regulated business, like that of a gas company, is not less than 8 per cent.

**7. Statutes ⬅64(2)—Rate and calorific standard prescribed for gas companies inseparable.**

The rate and calorific standard prescribed by Laws N. Y. 1923, c. 899, for gas companies of New York City, are inseparable.

The opinion of Special Master James G. Graham, dated January 15, 1925, simultaneously with the filing of which a report, with numbered findings, in accordance with the views expressed in the opinion, was presented, is as follows:

"This is a suit in equity brought by the plaintiff, Consolidated Gas Company of New York, against the defendants, who constitute the Public Service Commission of the state of New York and the Attorney General of the state of New York, to determine the constitutionality of chapter 899 of the Laws of 1923, in relation to the price and quality of gas, and for a permanent injunction restraining the enforcement of the statute.

"By section 72 of the Public Service Commission Law (chapter 480 of the Laws of 1910), as amended by chapter 134, § 49, of the Laws of 1921, the Legislature empowered the commission to fix rates to be charged by a gas corporation, and also to establish a period, not exceeding three years, during which the rate so fixed should continue in effect, and thereafter until the commission should fix a different rate; and by subdivision 3 of section 66 of the same law, the commission was also authorized to fix a standard of quality of gas to be furnished by the companies to their consumers.

"The action was referred to me as special master by an order of Hon. Francis A. Winslow, United States District Judge for the Southern District of New York, dated the 24th day of July, 1923, as amended by an order made on the 7th day of August, 1923, directing me to hear the evidence, make the computations, find the facts and report the facts with my recommendations. The order appointing me fixed the 30th day of July, 1923, as the day on which hearings should commence, and provided that they should continue daily as nearly as possible until the completion thereof. Subsequently, by agreement of all parties and the consent of the District Judge, the parties were allowed until March 3, 1924, to complete their preparations for trial. From that day until August 1, 1924, I held sessions practically five days a week, except holidays and Saturdays, sitting morning and afternoon, and averaging five hours a day. There have been taken 10,515 typewritten pages of testimony, 1,037 exhibits have been introduced by the plaintiff, and 115 exhibits have been introduced by the defendants. The minutes of the testimony have now been printed, and I shall file with my report a printed copy of the transcript.

"In accordance with the requirements of

the order of August 7, 1923, and the accustomed practice in the trial of rate suits in equity in this district, I submitted to the counsel for all parties on December 12, 1924, a preliminary draft of my report and of this opinion as well. On December 29, 1924, I received from the counsel preliminary written and verbal statements embodying their suggestions and criticisms regarding the matters covered by said preliminary drafts, whereupon I have proceeded to complete and file my report and opinion in its final form, which alone is to be taken as completely embodying my findings and conclusions. For the purpose of placing before the court as concisely as possible the contentions in reference to the legal questions involved and the facts relative thereto, I have hereinafter set them forth.

"Difference Between Present and Former Suit.

"At the outset it seems proper to call the court's attention to certain material differences, both as to matters of law and as to questions of fact, between the issues presented in this suit and those which arose and were determined in the prior litigation. Consolidated Gas Co. v. Newton (D. C.) 267 F. 231; Id., 258 U. S. 165, 42 S. Ct. 264, 66 L. Ed. 538. In that suit the plaintiff company sought a decree declaring unconstitutional, because confiscatory of its property, chapter 125 of Laws N. Y. 1906 (generally known as the Eighty-Cent Gas Law). The basis of its claim was that the maximum selling price of 80 cents per 1,000 cubic feet of gas allowed by that statute did not net the plaintiff a fair return upon the reasonable value of its property necessarily used in the manufacture and distribution of gas to its consumers in the borough of Manhattan, city of New York. This was the sole legal question involved. The master and the District Court took the investment of the plaintiff as the rate base. It was found that the Astoria plant was essentially a manufacturing department of the plaintiff, and to test the cost of making gas the court took house A and house D of that plant (being the houses at which coal and water gas were respectively manufactured at the lowest reported cost). This was conceding to the defendants the utmost of their contentions as to the basis of cost of operation on which the statute should be tested. The District Judge, in approving the master's report, stated that 'for the purposes of that suit he had resolved all questions of fact against the plaintiff, to see

if by any possibility the statutory rate could be a fair rate.'

"The decree adjudging the rate confiscatory was sustained by the Supreme Court of the United States. While in that case some evidence was introduced as to the cost of reproduction of the plaintiff's property, it was not strongly pressed as the 'rate base' for the purposes of that suit, for the reason that on the minimum cost of operation thus taken by the District Judge it appeared that the return was insufficient to net the company a fair return on its investment in any event, and that the operating costs had in fact come to exceed the rate.

"In the present suit, not alone is the statutory rate alleged to be confiscatory on the general grounds set forth in the previous suit, but the statute is attacked on various other grounds. The provision requiring the plaintiff to furnish gas of a standard of not less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure, to all its consumers, is claimed to be in violation of the Fourteenth Amendment of the Constitution of the United States, on various grounds set forth in the complaint. It is also claimed that the passage of the statute was in violation of section 10 of article 1 of the Constitution of the United States, in that it impairs the obligation of the plaintiff's contract with the state of New York, and it is also claimed that various other provisions of the statute are arbitrary, oppressive, unreasonable, and unduly discriminatory and in violation of various provisions of the Constitution of the United States.

"In this suit, the plaintiff undertook for the first time to give full and complete proof of what it asserted was the present reproduction cost and present value of all of the property used by it in its gas business. It presented what it claimed was a complete inventory and appraisal of such property, and supported it by the testimony of various witnesses. It also presented what it claimed to be its investment therein up to December 31, 1923, according to its books and according to the findings of the court in the prior suit plus net additions. The plaintiff also presented proof of its stock capitalization, its outstanding indebtedness, the amount claimed to be properly allowable for working capital, the amount of the undistributed structural costs at their original cost figures per books and at their present replacement cost per engineering estimates, and a comprehensive study and evidence which it claimed established a basis for an allowance for 'going

value.' Evidence was presented of the cost of making gas by each separate plant of the company, and of the Astoria Company, and of the cost to the company as a whole, and of the cost of making gas by the Consolidated transfer of gas system companies.

"The defendants presented no proof on the subject of the reproduction costs of the property, except as to the Astoria tunnel. As to that property, the defendants offered proof that the plaintiff's reproduction cost estimates were too high. The defendants contended that investment cost was the proper basis. They presented no evidence as to the cost of operation of the plaintiff at all of its plants, or of the transfer of gas system as a whole; but the defendant Attorney General offered in evidence an estimate of what he claimed should be the proper cost of making gas by the Astoria Company for the 12 months to end April 1, 1925, and more particularly by the two units of the Astoria Company heretofore mentioned, which the defendants asserted should be the basis for testing the statute, and a comparison of the cost of making gas at these selected plants with that of the cost reported at the other plants of the company. They presented no evidence on the subject of the cost of distribution of the gas to the company's consumers, as to the cost of making the purchased gas, or as to the basis on which payments were made for the same. Aside from the evidence presented by the Attorney General's engineer expert as to what he estimated gas might be made for in the future at the Astoria plant and at these selected units, the only testimony presented in contradiction of that introduced by the plaintiff was as to the proper allowance to be made for working capital, as to the reproduction cost of the Astoria tunnel, and as to the present value of the land owned and used by the plaintiff.

"The defendants did, of course, put the plaintiff generally to its proofs, and in their briefs they set forth various reasons why the purely legal objections urged for condemning the statute should not prevail. They also attacked plaintiff's evidence by cross examination of considerable duration. It will be seen from this short review that the questions presented to the master for determination differed in many respects from, and were much more varied and extended than, those brought up on the prior hearing. In view of the difference in the facts and in the rate, and these additional legal grounds raised, the determination in the prior case has little bearing on the new issues in the present litigation.

"Basis of the Action. ·

"The plaintiff is a corporation organized under the laws of the state of New York, engaged in supplying gas to inhabitants of the borough of Manhattan, city of New York. The defendants are public officials charged with duties in respect to the enforcement of the statute hereinafter mentioned. By chapter 899 of the Laws of 1923, entitled 'An act to amend the Public Service Commission Law, in relation to the charge for illuminating gas in cities containing a population of one million or over,' chapter 480 of the Laws of 1910 was amended by inserting therein a new section reading as follows:

"'Sec. 67-a. *Charge for Gas in Cities of One Million or More.* A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The public service commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum.'

"This act further provided that it should take effect immediately, and it became effective by the signature of the Governor of the state of New York on June 2, 1923. Chapter 899 of the Laws of 1923 thus undertakes to fix $1 as a maximum price which gas corporations in any cities having a population of 1,000,000 or over may charge for gas sold to consumers other than the municipality— the price to the city of New York as a consumer being regulated by another statute— and undertakes to prescribe, as the standard of quality of the gas to be furnished at such price in such cities, a calorific content not falling below 650 British thermal units per cubic foot.

"Plaintiff is one of the corporations designated in said section 67-a, and the city of New York is the only city in the state of New York having a population of over 1,000,000 inhabitants. By an order made by the Public Service Commission of the state of New York, on August 30, 1922, effective October 1, 1922, the said commission, as then authorized by statute to do, fixed rates to be charged by plaintiff to its consumers (other than the city of New York) ranging from $1.15 per 1,000 cubic feet for the first 100,000 cu-

bic feet of gas per meter per month to 95 cents per 1,000 cubic feet for over 1,000,000 cubic feet per meter per month. Practically all the gas sold by the plaintiff comes within the first class.

"By an order entered in its case No. 108 on August 30, 1922, closely correlated with its rate order as to the plaintiff on the same day, the commission had authorized all gas companies in New York City to furnish to their consumers gas which would 'have a total heating value on a monthly average (made up of the daily averages) of not less than 537 British thermal units per cubic foot, and a daily average (made up of the daily averages) of not less than 525 British thermal units per cubic foot on any three consecutive calendar days in any month.' The order further provided that the heating value of the gas furnished by a gas corporation should not, on any three consecutive calendar days, have a maximum variation upward of more than 5 per cent. of such monthly average heating value as the company did maintain and furnish, under the above-quoted provision.

"The requirement for the furnishing of the quality of gas conforming to the British thermal unit standard was to become effective on and after October 1, 1922—that is, a month after the order was entered—so that the gas corporations affected by the order, including the plaintiff, were allowed time to make the necessary preparation for changing the standard.

"The special statutory court held unanimously that the plaintiff made out a case for an injunction restraining the taking effect of the act in question, and, pending the final determination of the court, authorized the plaintiff to charge a rate of $1.15 per 1,000 cubic feet of gas sold except to the city of New York, such rate pendente lite being that prescribed by the Public Service Commission by its order in case No. 79, and its continuance under the temporary injunction was authorized on the basis that, during the pendency of the action, the plaintiff would continue to furnish gas of the quality then being supplied under the commission's order in case No. 108.

"Organization of the Plaintiff.

"The plaintiff, Consolidated Gas Company of New York, controls, directly or indirectly through stock ownership, the corporations known as the Astoria Light, Heat & Power Company, the Standard Gaslight Company of the City of New York, the Central Union Gas Company, the Northern Un-

ion Gas Company, the New Amsterdam Gas Company, the East River Gas Company of Long Island City, the New York & Queens Gas Company, and the Bronx Gas & Electric Company, each of which corporations is engaged in the business of manufacturing or furnishing, or both, gas in parts of the boroughs of Manhattan, the Bronx, or Queens, in the city of New York. These companies have been commonly referred to in the hearings before me, as the 'affiliated gas companies.' Aside from the New York & Queens Gas Company and the Bronx Gas & Electric Companies, the mains of the above-named companies are to an extent interconnected, as hereinafter described.

"The Consolidated Gas Company formerly manufactured gas by the coal gas and the water gas processes at plants in the borough of Manhattan, but since the physical retirement of its East Fourteenth street and West Forty-Second street coal gas plants, in October, 1923, it has manufactured gas only by the water gas process, supplemented by the gas plant of the Astoria Light, Heat & Power Company in Astoria, and distributes the gas in the borough of Manhattan. The Astoria Light, Heat & Power Company has a large plant in Astoria, Long Island City, in the borough of Queens, at which it manufactures gas by the coal gas and the water gas processes; it has but a few private consumers, in the vicinity of its plant, to whom it distributes gas. The Standard Gaslight Company of the City of New York manufactures water gas at its plant located between East 114th and East 116th streets, and between Pleasant avenue and the East River, in the borough of Manhattan, and distributes gas to its consumers in the boroughs of Manhattan and the Bronx. The New Amsterdam Gas Company manufactures water gas at Ravenswood, in the borough of Queens, and distributes gas to its consumers in the borough of Manhattan. The East River Gas Company of Long Island City distributes gas to its consumers in the boroughs of Queens and Manhattan. The Central Union Gas Company manufactures coal gas and water gas, and distributes gas to its consumers in the Twenty-Third ward of the borough of the Bronx. The Northern Union Gas Company does not manufacture gas, but distributes gas, which it obtains from other companies, to its consumers in the Twenty-Fourth ward of the borough of the Bronx. These companies comprise what is commonly referred to as the transfer of gas system of the Consolidated Gas Company.

"The New York & Queens Gas Company

manufactures water gas at its own plant in Flushing, in the borough of Queens, and distributes the gas in the Third ward of the borough of Queens. The Bronx Gas & Electric Company manufactures water gas at its own plant in the borough of the Bronx, and distributes the gas in that portion of the borough of the Bronx lying east of the Bronx river. The manufacturing plants and distributing systems of these two companies are operated as units separate from the Consolidated transfer of gas system, and are wholly detached from the plants and distributing system of the Consolidated system companies.

. "The various companies are each maintained as separate entities, and each has its own board of directors, executive officers, and departmental managers. The manufacture and distribution of gas by the New York & Queens Gas Company and by the Bronx Gas & Electric Company are conducted as separate enterprises, entirely apart from the manufacture and distribution of gas by the other companies. However, such advantages and economies as can be effected for the operations and business of the New York & Queens Gas Company and the Bronx Gas & Electric Company through purchases of coal, oil, and other materials, or through the availability of the extensive experience of executives and technical officers and employés of the Consolidated Gas Company, are also afforded to the New York & Queens Gas Company and the Bronx Gas & Electric Company.

"Intercompany Relations.

"The development of the interrelationship of the gas companies of the Consolidated transfer of gas system has been greatly in the interest of the public, as well as of the companies and the investors in their property. For a number of years prior to 1900, the gas companies operating in the borough of Manhattan and certain portions of the Bronx were engaged in competition, which was detrimental to the public no less than to the several companies, involving wasteful efforts and expenditures and duplications of investment, and consequent high carrying costs. In or about the year 1900, the Consolidated Gas Company acquired its holdings of the capital stock of the other companies operating within the borough of Manhattan, and indirectly the capital stock of the East River Gas Company, the Northern Union Gas Company, and the Central Union Gas Company.

"It was then determined to discontinue any further unnecessary duplication of invest-

ment, either in plant, mains, or services. This course, not only terminated the waste due to duplication of properties, but enabled the companies, by an intensive use of their properties, the centralization of certain services, the joint use of facilities, the extending of gas facilities owned by one gas company for use by another gas company, the purchase of materials and supplies in large quantities, the standardization of methods, and the interchange of information as to improvements and developments in the art, etc., to effect economies in operating costs, property investments, and carrying charges. Out of this co-ordination of the facilities and operations of the companies grew a system of intercompany charges therefor.

"When the policy was adopted of discontinuing any further unnecessary and avoidable duplication of investment in mains and services, it became a question of utilizing the existing distribution systems to the maximum advantage to the public. In order, therefore, to insure an adequate supply of gas at all times throughout the city, maintain the utmost uniformity of pressure, and insure uninterrupted service by facilitating the interchange of gas between the various companies, the storage holders and gas mains of various companies were gradually tied in and interconnected. Aside from the tying-in of mains due to the foregoing considerations, there has been, considerable tying-in, in the borough of Manhattan, occasioned by the extensive subway construction by the city of New York in recent years, which has at many places necessitated the installation of single surface or overhead by-passes in place of such mains of the various companies as were temporarily rendered unavailable for use, because of the conditions created by the subway construction.

"The holder stations and distribution mains of the plaintiff are, at certain points, connected with what is commonly referred to as the gas transfer system of the Consolidated Gas Company, in Manhattan, the Bronx, and Long Island City. This interconnection of mains enables an exchange of gas between the distribution systems of the Consolidated Gas Company of New York, the New Amsterdam Gas Company, the East River Gas Company of Long Island City, the Standard Gaslight Company of the City of New York, the Central Union Gas Company, the Northern Union Gas Company, and the Astoria Light, Heat & Power Company.

"The holders and the transmission and distribution mains of each of the companies

named are connected, at suitable points, with the general transfer system, so that the gas manufactured in any plant can be delivered into this general transfer system, and from its transmission main can be taken into the holders and distribution mains of the other companies connected with this transfer system. In this way the gas made by all of the companies is delivered into the general transfer system, to insure adequacy and continuity of the supply of gas, in that the manufacturing capacity of each plant on the transfer system is made available toward meeting the requirements of all the companies on the transfer system, and the required reserve plant capacity, being available to all of the companies at the same time, is much less in ratio than would be essential if each company operated independently, without any interconnection of mains, and so had each to provide all of its own reserve capacity in its own plants.

"A further advantage accrues to the consumers of all the companies by these interconnections, in the protection and assurance which it affords against interruptions in the supply of gas through accident or catastrophe. If a given company finds that, either temporarily or permanently, it has not plant capacity of its own sufficient to meet the requirements of its own consumers, it secures the use of the additional plant capacity necessary for its service, from a company having plant capacity in excess of the present and immediately prospective requirements of such company; and for such manufacturing capacity, thus devoted to its use by the producing company, it pays a sum covering taxes, insurance, renewals, and replacements, and a return of 8 per cent. on investment, and it purchases from the producing company the additional quantity of gas required by its consumers, and pays therefor to the producing company the cost of the gas produced, being governed, as to the amount of gas so purchased, by the demands of its consumers and the practical operating conditions in its own manufacturing plant.

"As an inevitable result of the foregoing, it has become impracticable, as an engineering matter, to identify the gas in most of the holders and gas mains as having been manufactured at any particular plant or by any particular company. After the gas, manufactured in a plant of the Consolidated Gas Company or of one of its affiliated companies, has left the plant, no attempt is made thereafter to identify it as to source. Its production has been standardized as to materials, method, and calorific content. Even if delivered from the manufacturing plant immediately into a distribution main, it would almost immediately become mixed with gas emanating from some other point and manufactured at some other plant of the system. It would be impossible for any manufacturing or holder station so to control the pressure at these points as to regulate exactly the amount of gas being supplied into the mains by each company, without at the same time affecting, disadvantageously to the public, the pressure at many other points. As the result of interconnecting the distributing systems of the companies operating within the same territory, a certain amount of gas is exchanged due to no other cause than the variation in the pressure in the gas mains at certain points where they interlock, such variation being due to the normal fluctuations in the use of gas by consumers in the different areas; so that, if each company had manufacturing plant capacity fully adequate for all of its own requirements, there would, nevertheless, occur some interchange of gas between the companies whose mains were thus connected. The amount of gas exchanged between the companies is therefore not a matter of exact control, and could not economically or practically be subject to such control.

"The five important factors in connection with the gas transactions of each of the gas companies in the transfer system are: (a) The quantity of gas on hand at the beginning and end of the month; (b) the quantity of gas manufactured; (c) the quantity of gas sent out; (d) the quantity of gas sold; (e) the quantity of gas used by the company.

"At the manufacturing plants of the plaintiff and the affiliated companies on the transfer of gas system, hourly records are kept of the quantity of gas made as recorded by the station meters. At all of the manufacturing plants and holder stations, hourly records are kept of the quantity of gas on hand and gas sent out. Daily reports of the details of the manufacture and send-out of gas by each of the gas companies of the Consolidated transfer of gas system are filed with the plaintiff, and monthly and periodic statements are similarly made of the operating details of each company, which become the basis of determining the quantities of gas interchanged among the companies.

"The factors used in determining the quantity of gas interchanged among the companies in a calendar month are based upon the following: (1) The amount of gas sent out by each company's manufacturing plants.

(2) The amount of gas accounted for by each company as being sold to its consumers and as used by the company in its own offices and plants. (3) The difference between the aggregates of items (1) and (2) indicates the total amount of gas unaccounted for by all companies. (4) The unaccounted for gas is distributed among the companies according to calculations made by the engineers of the companies, so as to apportion to each company the unaccounted for quantity attributable to the distribution of gas for its own consumers. (5) Combining the amount of gas accounted for by each company (2) and the amount of unaccounted for applicable to its gas business (4) gives what may be termed the total requirements of each company. (6) Comparing the amount of gas sent out by each company's manufacturing plant (1) with the same company's total requirement (5) indicates which is a creditor and which is a debtor company, the agreement under which gas is interchanged indicating the particular creditor company to which each debtor company is a debtor. (7) The creditor company bills the debtor company for the amount of gas shown by the foregoing computation to have been manufactured by it for such debtor.

"The other companies of the Consolidated transfer of gas system take and pay for all of the gas sent out by the Astoria Light, Heat & Power Company, excepting that used by the Astoria Company in its plant and a small quantity sold to a few consumers in the immediate vicinity of the plant, and have done so since the Astoria Company began manufacturing gas in December, 1906. The intercompany charges made for services, materials, or the use of facilities are intended to include the actual cost of labor and materials furnished by one company for the benefit of another, the actual maintenance cost of property used, the carrying cost, at an 8 per cent. rate of interest, of the investment devoted by one company to another's use, and, where reasonable and proper, an added charge for undistributed expenses.

"The fact that one company or another performs the service or makes the investment in the property jointly used by several or all of the companies tends to decrease the amount of necessary investment, and hence to lessen the cost of the service to the consumers, taking all elements into account. The company which possesses the facilities or commands the forces, either by reason of a prior location, a franchise right, or adaptability for the work, renders the service or lets the use of facilities to the other compa-

ny. The creditor company economizes in its own expenses by reason of the intensive and full utilization of its property and the smaller cost per unit of service. The debtor company effects corresponding economies, minimizes investment and carrying costs, avoids duplication, and receives service or the use of property at cost. The practice of the companies in respect to prorating expenditures and carrying costs for the benefit of two or more of them is illustrated by the charges made by the plaintiff to affiliated companies, during the years 1922 and 1923. These charges fall within the general classifications of (a) departmental expenses; (b) services of employees; (c) use of facilities; (d) employees' societies; and (e) labor and materials furnished.

"For the services of the Consolidated Gas Company's engineers and superintendents in connection with construction projects, as reflected in the account 'engineering and superintendence,' the plaintiff charges the other companies their respective proportions of the expenses of the construction department on the basis of the ratio of the construction expenditures of each company to the total expenditures of all the companies for construction work during the calendar year. The cost of maintaining the department of mains and services, including the several branches, is prorated among the plaintiff and the other gas companies in Manhattan according to the ratio of each company's miles of mains to the total miles of mains. The cost of maintaining the gas promotion department is prorated among the companies on the basis of the ratio of the number of gas appliances of each company on the district to the total number on the district at the beginning of the year. For maintaining the department of claims and arrears, for maintaining the recording pressure gauges at various localities in the Borough of Manhattan, for operating for joint use the Sixty-Third Street gas storage station and the Kingsbridge gas storage station, for maintaining the chemical department, including the operating of the chemical laboratory, for maintaining the office of the advertising manager, for maintaining and operating the general office restaurant for employees, for maintaining the meter shop school of instruction, for pumping drips, and for the personal services of certain employees, and the like, the costs are apportioned among the companies directly benefiting, upon an equitable and fair basis equally applicable to the plaintiff and to each interested company.

"For the use of space in the general office

building of the plaintiff, the charges are made to affiliated companies upon the basis of the number of square feet occupied at various rates according to location, and include only the proportion of the operating and maintenance expenses applicable to such rented space and of the carrying cost of the investment in the rented portion of the building. A charge is made by the plaintiff to other gas companies for the use of the former's property jointly used, and such charges are prorated according to the extent of use and include a proportionate share of the maintenance expense and the carrying cost of the investment in the property devoted to the use of other companies and used by them. The expenses in connection with the maintenance of the gas companies' employees' mutual aid society and other employees' societies are prorated on the basis of the relative membership of the employees of each company in such organization.

"Materials and labor are furnished by the plaintiff to the other gas companies at cost plus a percentage to cover indirect expenses actually incurred. The amounts representing the added percentages are credited to certain expense accounts of the plaintiff and offset equivalent undistributable and unsegregated amounts of operating expenses. Such materials and labor are furnished by the department of mains and services, in connection with street work, such as laying new mains and services, repairing mains and services, etc., and by the automobile repair shop in connection with repairing and overhauling automobiles. In this category are also gas appliances delivered from the plaintiff's stock to affiliated gas companies.

"In these and in other ways the plaintiff and its affiliated companies are enabled, through such co-operation, to effect savings in the amount of property and in the operating expenses, while securing at least as good results as, and in many instances better results than, each company could secure by independent operation. The plaintiff maintains an emergency department, which has five separately located stations in the borough of Manhattan, equipped with vehicles and apparatus for responding to fire calls in co-operation with the fire department of the city of New York, or for any emergency that may occur by reason of any leak of gas, and responding with the greatest expedition to any call. Each Manhattan company, if operating alone, would be obliged individually to maintain several of such stations, at a cost greatly exceeding that which it pays as its proportionate share of the maintenance cost of the existing stations, and would not have the benefit of as many stations and as quick service as it now has, and with the resultant confusion of duplicate emergency crews responding to calls, and the addition of fast-moving motor vehicles to the traffic confusion on already crowded streets.

"Methods of Business.

"The plaintiff itself at the time the action in question took effect had manufacturing plants of its own on Manhattan Island at Eleventh, Fourteenth, Twenty-First, Forty-Second, and Ninety-Ninth streets; the Eleventh, Twenty-First and Ninety-Ninth being water gas plants only, and the Fourteenth and Forty-Second street plants being constructed as coal gas plants only. In June of 1923, the two latter plants were used only as reserve or stand-by plants, and had been so used and maintained for some years past; a very small amount of gas having been actually manufactured at either plant, although both plants were kept in a condition to be operated to capacity should the occasion arise. These two plants were withdrawn from service on October 31, 1923, the capacity of the Twenty-First street water gas plant having been increased to an amount at least equalling that of the two plants discontinued, so that the manufacturing capacity owned and operated by the plaintiff at the present time is substantially the same as it was on June 1, 1923, although differently distributed.

"As before stated, the plaintiff owns all of the stock of the Astoria Light, Heat & Power Company, situated at Astoria, Long Island, where have been erected two water gas and two coal gas units with a combined daily capacity of some 86,000 M. cubic feet, substantially all of which is available for sale to other companies as it sells and uses itself only some 57 M. cubic feet. The New Amsterdam Gas Company, as the owner of the Ravenswood plant at Long Island City, has also between 9,000 and 10,000 M. cubic feet of daily manufacturing plant capacity over and above its own needs. All the other companies in the Consolidated system have, and with the exception of the former New York Mutual Gaslight Company (up to August 30, 1922) have had, during the period litigated before me, a manufacturing capacity less than their individual requirements, and were compelled to buy gas manufactured at either the Astoria or the New Amsterdam plants.

"The Consolidated Company manufactures about two-fifths of its total requirements and buys the rest from the Astoria Company.

The balance manufactured by the Astoria Company and the surplus manufactured by the New Amsterdam Company is sold to the other system companies.

"In this connection it is proper to state something of the arrangement of the storage and distribution systems by which the gas is distributed throughout the borough of Manhattan by the plaintiff company and the other companies on the transfer system.

"Gas from the Ravenswood plant of the New Amsterdam Company and the Astoria plant of the Astoria Company passes through the Ravenswood and Astoria tunnels, under the East River, to points on Manhattan Island, and there has been constructed a system of interlocking transfer mains by which gas which is manufactured at these plants or at any plant of any company in the so-called transfer system can be furnished, through storage holders and transfer mains, to the distributing mains of any company, so that if one company has a surplus and another a deficiency of supply the surplus is available, and in this way the entire reserve of the system is available to any company. It also, however, makes it difficult, if not impossible, to say that gas supplied to the consumers of any company is entirely manufactured by any one of the companies or plants operated by such company. This is one of the difficulties in attempting to determine the actual cost of manufacturing and distribution of gas as applied to any individual company.

"As a matter of fact, it is well known that the Public Service Commission of this state has stated that the proper way to consider the subject would be to treat the plaintiff company and the New Amsterdam, the East River, Central Union, Northern Union, Standard, and the Astoria Companies as one system, rather than to attempt to consider and treat the companies individually, and to regard the Astoria Light, Heat & Power Company as merely a manufacturing plant of the system, as it is in effect. It seems clear that this method of operation results in marked economies, for the reason that it permits the purchase of supplies for the companies as a whole and their availability for any company as needed and the elimination of separate construction departments, and lessens the necessity of each manufacturing company maintaining its own reserve manufacturing plant and holder capacity. Treating the Astoria plant as a manufacturing plant of the Consolidated Company alone would give the Consolidated and New Amsterdam Companies a capacity and a reserve in excess of the present needs of their own patrons, and the other companies would not have sufficient output and reserve for their present needs, and would be obliged to construct additional manufacturing facilities for their own use.

"Even treating the companies as comprising one system, there is less than 20 per cent. of reserve capacity, and whenever the reserve falls below that amount both the plaintiff's and defendants' witnesses agree that additional reserve manufacturing capacity should be provided. To meet this condition the plaintiff has purchased a tract of land at Hunts Point on the East River, and proposes to construct, beginning in 1925, additional manufacturing capacity there, for operation as soon as completed, and to develop the property in accordance with the needs of the business through a period probably running in the neighborhood of ten years. Engineer and expert witnesses for both plaintiff and defendants agree that a certain proportion of the production would preferably be of coal gas, irrespective of its relative cost at the present time, so as to preserve a flexibility to meet conditions which might be encountered in the opration of gas plants; but both agree that coal gas plants cannot be operated, and so should not be built, if gas must be produced to be delivered to the consumer at a minimum standard of 650 B.t.u. This is one of the reasons why the plans for the full future development of the Hunts Point plant had not been determined at the time testimony closed before me. The construction of certain coal gas units is desired, and their construction cannot be safely undertaken while this provision of the statute remains upon the books.

"Incidentally, it may be stated that, inasmuch as both the plaintiff and the defendants' witnesses agree that this portion of the statute would prevent the use of coal gas plants now owned and operated by the Astoria Company, and would have prevented the use of the Fourteenth and Forty-Second street plants down to their abandonment late in 1923, it would have been, and would now be, in view of the evidence in this case, an illegal confiscation of such property, and therefore obnoxious to the Constitution, if the Astoria Company is merely a manufacturing department of the Consolidated Company, as is the way in which it was treated by Judge Hand in the former suit and is here taken.

"In the operation of this gas business in New York, while the corporate entity of the different companies has been preserved, and

each has its own separate organization and operation in many respects, the Consolidated Gas Company has exercised its control to the extent of making contracts for oil, gas, and some other major supplies for joint requirements of the companies, including the Astoria Company, and supervises and in some instances performs the work of new construction and of extensions and repairs to mains and services.

### "Rate Base.

"In the case of Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, it was held by the Supreme Court that, in determining the amount and value of property on which this plaintiff is constitutionally entitled to earn a fair return, the value of the property at the time of the inquiry must be adopted. In the second series of litigation as to this plaintiff's rates (Consolidated Gas Co. v. Newton [D. C.] 267 F. 231; Id., 258 U. S. 165, 42 S. Ct. 264, 66 L. Ed. 538), it was found that the value of the company's property, for the purposes of that case, was at least the amount of the actual and unimpaired investment therein, and that sum was sufficient to demonstrate the confiscatory character of the 80-cent rate then under review.

"In the present case, although the plaintiff has proven the amount of the investment in all of the property used in serving its consumers, it has also offered evidence to establish what it claims as the present reproduction cost, and insists strenuously that the latter is the true economic measure of the present value which it is the duty of the court to find as the 'rate base.' In its reproduction costs of its property, over and above the 'bare-bones' cost of its inventoried physical property, if replaced on a subcontract basis, the plaintiff includes certain undistributed structural costs applicable to such construction project, and also claims and offered a considerable amount of evidence as to going value, and on the subject of the proper allowance for working or floating capital.

"The Supreme Court of the United States has laid down the rule that it is present value of the company's property used for the benefit of the public upon which it is entitled to earn a reasonable return. San Diego Land, etc., Co. v. National City, 174 U. S. 739, 19 S. Ct. 804, 43 L. Ed. 1154; San Diego Land, etc., Co. v. Jasper, 189 U. S. 439, 23 S. Ct. 571, 47 L. Ed. 892; Stanislaus Co. v. San Joaquin, 192 U. S. 201, 24 S. Ct. 241, 48 L. Ed. 406; Willcox v. Consolidated Gas Co., supra; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244; Bluefield Water Works v. Public Service Com., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 39 S. Ct. 454, 63 L. Ed. 968; Southwestern Bell Telephone Co. v. Public Service Commission, 262 U. S. 277, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807, and many other cases.

"The difficulty lies in determining the manner in which such present value is to be computed and found. It is true that the Supreme Court of the United States, in the very recent cases of Georgia Railway & Power Co. v. Railway Commission of Georgia, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144, and Bluefield Water Works Co. v. Public Service Commission, supra, reiterated its approval of the doctrine of Smyth v. Ames, 169 U. S. 466, 546, 547, 18 S. Ct. 418, 434 (42 L. Ed. 819), that 'the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case," but just how this rule is to be applied, and just how much and what weight is to be given each element therein referred to, is left undetermined and is not rendered clear by any of the recent decisions of that court. In the Southwestern Bell Telephone Co. Case, supra, and the Bluefield Water Works Case, supra, it was held that the reproduction cost is the dominant and determining element in determining the full present value on which a fair return is held a constitutional right. In the latter case the finding of the commission was set aside, because it was deemed that due regard had not been given to reproduction cost as of the time of inquiry.

"On the other hand, in the Georgia Railway & Power Case, supra, the Supreme Court refused to set aside a finding of a commission, and indicated that reproduction cost at the date of the inquiry was not necessarily controlling. That eminent member of the court, Mr. Justice McKenna, stated that he was unable to reconcile the decision in the cases referred to. Then Mr. Justice Brandeis, in an elaborate dissenting opinion (S.

W. Tel. Co. v. Pub. Service Commission, 262 U. S. 289, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807), in which he reviews the subject with great ability, has taken the position that original or historical cost is the proper 'rate base,' and in this he has the support of Mr. Justice Holmes. It is apparent, therefore, that even in this court of last resort there is as yet no unanimity on 'the subject of how present value is to be ascertained.

"There is another feature present in many of the cases decided which adds to this confusion. Although refusing to accept full current reproduction costs as the measure of present value, the courts and commissions have commonly allowed the appreciated value of the land on which the company's business is carried on; and this has been done contemporaneously with a refusal to allow the appreciated value of the buildings and manufacturing plants erected thereon. Instances of this occur in Bronx Gas & Electric Company v. Public Service Commission, 28 N. Y. State Dept. Repts. 329, P. U. R. 1923A, 255, 22 Rate Research, 83; Bronx Gas & Electric Co. v. Public Service Commission, 190 App. Div. 13, 180 N. Y. S. 38; Brooklyn Borough Gas Company v. Public Service Commission, 17 N. Y. St. Dep. Rep. 81, P. U. R. 1918F, 335 (in which former Justice Charles E. Hughes was the referee); the Georgia Railway & Power Co. Case, supra, and other cases.

"To my mind there is an inconsistency about this holding which I cannot reconcile. I cannot see any reason, and know of no legal principle, which justifies a different treatment of one part of a public utility's property from another. It seems to me the Supreme Court of the United States must finally take a clear and definite position one way or the other. The court must say that it is the present reproduction cost of all of the property, either with or without depreciation, as the proofs in the specific case may require, which is to furnish the basis upon which a public utility company must be permitted to earn a fair and reasonable return at the present rates for money, or that it is the original cost of the same property, plus net additions to date, perhaps with the same proviso as to depreciation, but with the rate of return adjusted so that the property will earn for its owners a present return varying with the purchasing power of a dollar.

"Assuming a plant originally costing $1,000,000 in pre-war times, and earning and entitled at the time of its construction to earn 8 per cent., the owners would receive $80,000 annually, in money worth 100 cents on the dollar. If to-day it would cost $2,000,000 to reproduce the same plant, and the owners received and were entitled to receive 8 per cent., they would receive $160,000; but, if their $160,000 is only worth 50 cents on the dollar, they would be receiving in fact and real value only the same as they received in pre-war times, when the purchasing power of the dollar is considered (which, in fact, is the only true measure of return), although their capital investment may have a present value apparently of twice its original cost. Or if the process is reversed, and instead of taking the present reproduction value of the plant, the rate of return on the original investment is increased in accordance with the depreciation of the dollar, and the owner receives 16 per cent. on the original cost, the same result is obtained. The converse of the proposition is of course true, and if the dollar has appreciated to the same extent the result can be regulated by so adjusting the rate that the return will be decreased in proportion.

"An extremely able discussion of this subject is found in Judge Learned Hand's decision in Consolidated Gas Co. v. Newton (D. C.) 267 F. 231; Id., 258 U. S. 165, 42 S. Ct. 264, 66 L. Ed. 538, with which I am in full accord. It is of extreme importance that some definite method or standards for ascertaining the present value of property devoted to public uses should soon be adopted, and that the present vagueness and uncertainty as to how present value is to be found should be terminated. It would be much easier in these days of regulatory commissions, where both original investments and additions thereto are subject to scrutiny, to use the investment basis and additions thereto, and adjust the return, as the purchasing power of the income appreciates or depreciates, by varying the rate of return, and so the rate to be charged consumers. Of course, operating expenses and return at different rates are necessarily to be taken into consideration, but the probative value of evidence as to the amount and market value of bonds and stocks is not so clear. These latter may and frequently do fluctuate greatly, and are affected by conditions bearing but 'slight relation to the intrinsic value or earning capacity of the property, and in the case of this plaintiff these factors have ceased to have a bearing, as the plaintiff owns stock control of both gas and electric companies, aside from its own gas operations, and the value of its stock is not now dependent upon its own gas properties and the return received

therefrom, nor are its earnings the product of the gas business alone.

"In view of the present lack of a clear definition as to the manner in which present value is to be ascertained, I have taken fully the proofs both as to the original investment and additions thereto, and as to the reproduction cost at the present time (and the present condition of the property); and I have made findings as to both, as well as finding an amount which, in my opinion, represents the present fair value of property, giving due consideration to all the elements entering into it, as I understand to be required by the rule laid down by the Supreme Court of the United States in its approval of Smyth v. Ames, supra. I have also found an amount as going value under Des Moines Gas Co. v. Des Moines, supra, and Denver Union Water Company, 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649, and other cases, and of the valuation of 'franchises and rights' as determined by the Supreme Court as to this plaintiff in Willcox v. Consolidated Gas Co. in 1909.

"Counsel for the defendant Public Service Commission asks that no finding be made as to rate base or operating expenses, if a finding is made that the statute violates the contract provision of the Constitution. Inasmuch, however, as I am directed to find fully on all the matters referred to me, I believe it is my duty to find and pass on these questions, leaving it to the court to make its decree on such grounds as seem to it most desirable. In this decision I am confirmed by the opinion and the decree of Judge Winslow in the recent New York & Queens Co. Case (D. C.) 1 F.(2d) 351, P. U. R. 1924B, 138, P. U. R. 1924E, 60, 24 Rate Research, 100, 25 Rate Research, 35.

"In connection with both the investment and reproduction cost of plaintiff's property used and useful in the gas business is the determination of what properties are so used and their value. This relates especially to the land and plant values of certain properties which are specifically sought to be excluded by defendants.

### "Land.

"The defendants contend that of the real estate owned by the complainant the sites of the Fourteenth and Forty-Second street plants and a part of the site of the Kingsbridge holder are not used and useful, and should not be included in the rate base. As to the latter I am inclined to agree with the defendants, and deduct one-third of the value thereof. The plaintiff's witnesses in fixing a value on that property testified that it had been so valued by reason of the fact that it could be used for certain enumerated purposes. The northern portion is cut off from the portion occupied by the holder and buildings by a fence. It has been used apparently only as a tennis court. It brings in little, if any, revenue. If it has the value placed on it by plaintiff's witnesses for the purposes mentioned, it should be sold for such purposes.

"As to the Fourteenth and Forty-Second street plants, I must be governed by the evidence before me as to the use made of the property and the necessity therefor. I do not think it was successfully disputed that on June 1, 1923, both plants were being kept up as reserve plants, and could have been put in operation if the necessity arose within a comparatively short time. The machinery and equipment was there in good working order, and, while the company very properly did not maintain there a full working complement of gas-making labor, they could have been transferred from some of the other plants and the plants brought to capacity in a week, as Mr. Woods testified. I do not understand that Mr. Little, defendants' expert witness, disputes this fact. Undoubtedly the necessity of making gas there had not arisen for several years (since 1920), and the company was in 1923 in the process of adding to the Twenty-First street gas plant sufficient capacity to enable it to abandon the Fourteenth and Forty-Second street plants, which were objectionable for year-round operation in the borough of Manhattan on account of being coal gas plants.

"It is true the company had decided in 1923 that it would be advantageous to abandon these plants, but only when equal capacity had been constructed elsewhere. In the meantime, they had also purchased the land at Hunts Point and were arranging for the construction of large manufacturing units at that place. This latter project met with the approval of Mr. Little, the defendants' expert engineer; although he did not advise the abandonment of the Manhattan plants until the Hunts Point project had been initiated and the substitute capacity actually made available at the Twenty-First street plant.

"In the December 31, 1923, rate base, the Fourteenth and Forty-Second street plants are not included. They had been withdrawn from the fixed capital account, as they had been sold and dismantled, and the Hunts Point property had been purchased and added. One of the grounds for claiming that these two plants should be disregarded al-

together in the rate base is the fact that when withdrawn the gas-making machinery was junked. The evidence, however, shows that this is the case in almost every instance where a gas plant or parts of it are discarded. There is practically no market for it, and machinery and apparatus which when installed gives as good service as when new, becomes worthless when removed, or substantially so. Except for the desirability of removing coal gas plants from Manhattan Island and the purchase and prospective installations at Hunts Point, which contemplate an addition of probably 30,000,000 cubic feet of daily capacity within the coming year or two, it would not have been safe to abandon these two plants, as even with the additional capacity installed at Twenty-First street the reserve is below the point at which Mr. Little said the company should create additional capacity.

"As to the Hunts Point property, purchased at an expense of $2,265,103, I do not think it can be included at its full value in the plaintiff's rate base for two reasons: First, it is a projected development for the benefit of the whole system, and not for the plaintiff alone; second, it is not planned to develop it all at once, but through a period of from 7 to 14 years. The desirability and propriety of this purchase is conceded by defendants' witness, Mr. Little. While he does not advocate the removal of the present water gas plants of the plaintiff on Manhattan Island, and in fact says it would not be safe to do so within a period of 5 years, during which substitute capacity could be installed elsewhere, he says it would be good judgment to develop at least one other large plant, and that to provide for the growth of business it would be proper to have it located in the upper part of the city, as the Hunts Point property is. If it were to be all developed immediately, and it was for the benefit of the plaintiff, it would eliminate entirely the use of a portion of the Astoria plant for the plaintiff's benefit, and thus reduce its rate base in that particular. If it is only to be used partially for the plaintiff at the present time, and the same use is to be continued of the Astoria and East River properties, then not the whole of the Hunts Point property should be included in the plaintiff's rate base. In view of the fact that no plant has yet been erected, and the fact that just how the gas to be made there will be used is not known, I think it proper to allow but $500,000 therefor in the present rate base.

"The Present Value of the Land.

"This brings me to the question of the value to be accorded to the land so found used and useful. There has been presented to me the opinions of two real estate experts on behalf of the plaintiff and two on behalf of the defendant Attorney General, together with the assessed valuation of the respective parcels for the year 1924 made by the deputy tax commissioners of the city of New York. The witnesses are all men of large experience, who have been engaged in valuing property in and about this locality for many years. The plaintiff's witnesses are connected with two of the largest real estate companies in the city. The defendants' witnesses have been more particularly engaged in appraisals than in the general real estate business. As is usual where real estate experts are put on the stand to testify as to the value of different parcels of real estate, there is found a considerable difference in their views, not alone between those for the plaintiff and defendant, but between the two witnesses for each. This applies both to the property of the plaintiff and that of the other companies used by the plaintiff for the benefit of its consumers. These witnesses have been examined fully as to the basis on which they made their respective estimates and the data on which they based their figures.

"I have gone over the various appraisals and the testimony in regard to each with great care, and particularly with a view to arriving at the best judgment I could give as to the amount which would be fair and reasonable with these conflicting opinions before me. In my judgment the reasonable fair value of the land (unimproved) of the plaintiff on June 1, 1923, including the Fourteenth and Forty-Second street plants, but excluding one-third of the value of the Kingsbridge holder land, and taking off 61.8 per cent. of the joint office building leaves $13,460,000 as the value of the land of the plaintiff used in the gas business.

"In addition thereto there is the land of other companies used by the Consolidated for the benefit of its consumers. What has been said as to the testimony as to the land of the Consolidated Company applies to this, as the same witnesses were used and similar testimony introduced. I have valued the land of the Astoria Company at the sum of $4,350,000. Deducting the portion of the Luyster creek coal-handling and storage property devoted to the use of the New York Edison Company ($210,000) and apportioning the

remainder on the basis of the Woods' report gives 80.074419 per cent. thereof, or $3,314,-373.94, as the value of the portion used by the Consolidated Company. I have valued the land of the Standard Gaslight Company jointly used by the plaintiff at $52,000. Deducting two-thirds thereof, being the portion used for other companies, leaves $17,333 as the value of its land used by the plaintiff. The land of the East River Gas Company I have valued at $62,000. Deducting the proportion thereof as set forth in the Woods' report gives $34,996 as the value of that part used by the plaintiff. Summarizing these values gives the value of the land of the plaintiff and other companies used in the gas business, unimproved, as of June 1, 1923, as follows:

Consolidated Gas Company........$13,460,000
Astoria Light, Heat & Power Company ............................ 3,314,373
Standard Gaslight Company....... 17,333
East River Gas Company......... 34,996

  Total ..................... $16,826,602

"This total had changed on December 31, 1923, and as of the present time by the withdrawal of the Fourteenth and Forty-Second street properties for land sold, valued at $3,-547,055, and for the parcel at Forty-Second street still owned, valued at $135,000, not claimed in the gas business after the withdrawal of the station, and by the addition of the portion of the value of the Hunts Point property included herein, $500,000, and by the parcel of land adjoining the 132d street station property purchased at a price of $20,000, making the value of the land of the plaintiff owned and used in the gas business, as of December 31, 1923, $13,664,547.

### "Astoria Tunnel.

"Practically the only testimony introduced by the defendant Attorney General contradicting the evidence of the plaintiff as to present values (aside from the land) was to the reproduction cost of the Astoria Tunnel through which the gas from the Astoria works is conveyed to the distributing system in Manhattan. Plaintiff offered the testimony of Mr. John Vipond Davies, one of the engineers who originally had charge of the construction of this tunnel, and the defendant Attorney General that of Mr. Snow, an engineer in the employ of the city of New York as tunnel engineer in the board of estimate and apportionment. Both are well known, of wide experience, and of high standing in their profession. Mr. Davies estimated that it would cost to reconstruct the tunnel as of June 1, 1923, the sum of $8,750,-676; Mr. Snow that it would cost at least $5,708,582. The East River Gas Company's investment in the tunnel was the sum of $4,-691,897.68 as of December 31, 1922. Mr. Davies's estimate represents an increase from the original cost of something like 87 per cent.; Mr. Snow's about 21 per cent. Both have explained the methods they used to arrive at their results. Mr. Snow was handicapped to some extent by the necessity of taking a great deal of the data from which to make his estimates from a paper read by Mr. Davies some years ago before the Society of Civil Engineers, which data Mr. Davies testified was incomplete and did not contain all the items of cost of the tunnel. The different manner in which they arrived at their figures also rendered it difficult to make exact comparisons.

"I think a great deal of the difference in the two estimates is due to the fact that Mr. Snow did not have the full and complete information which was in Mr. Davies's possession in making his estimate. I cannot believe that a work of that magnitude and character could be constructed at present at an increased cost of only 21 per cent. over its original cost in 1910, having in mind the tremendous increase during and since the war in the cost of materials and labor. Mr. Snow admitted to certain omissions which increased his estimate to $5,903,884. After a careful examination of the testimony of both these gentlemen, I have come to the conclusion that a figure of $7,750,000, which is about a 65 per cent. increase over the original cost, is an amount which is a reasonable one, and I have so taken it.

### "Land Claimed Not to be Owned by Plaintiff.

"While there was some assertion on the trial that there was a question as to the land within the bed of Twelfth avenue between Forty-First and Forty-Second street and the North River, defendant's attack was principally upon the title to the land within the lines of the so-called Tompkins street between Twelfth and Thirteenth streets. There is no question but that both parcels are and have been for a period greatly in excess of 20 years inclosed and in full use and occupancy by the complainant, and were so used and occupied on June 1, 1923, and at the time of the hearing. Buildings are on some portions thereof, and other parts are used for necessary storage and other uses incidental to the manufacturing plants thereon established. The city has levied assessments upon and collected taxes from the plaintiff

on the theory of their ownership by it. No evidence was given that either had been legally opened as city highways, and as to Tompkins street the contrary was shown. The question as to the effect of adverse possession on the title to a city-owned and opened street does not enter into the case.

"Although I felt compelled to disagree with the plaintiff's contention that the title to these properties could not be raised in this proceeding (for which it cited Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034; Consolidated Gas Co. v. City of New York [C. C.] 157 F. 849, 858), I feel that the plaintiff's title to and its right to have the property taken into the rate base, has been sustained. While the question as to the title to the bed of Tompkins street between Twelfth and Thirteenth streets has not been directly before the court, it has as to that portion between Fifteenth and Sixteenth streets and between Fourteenth and Fifteenth streets, and on practically the identical state of facts the courts held against the claim of the city of New York. Matter of the City of New York, 217 N. Y. 1, 111 N. E. 256; Consolidated Gas Co. v. City of New York, Gavegan, J. The former case contains a full statement of the facts and law applicable to the question. It is unnecessary to repeat it here. Furthermore, it may be said in passing that as long ago as 1854 the city of New York contended that Tompkins street was not in existence. Nott v. Thayer, 15 N. Y. Super. Ct. 10. I think the plaintiff's witnesses correctly took into consideration the value of the entire property occupied by the plaintiff between Twelfth and Thirteenth streets and between Forty-First and Forty-Second streets, and I have included it in the rate base.

"It is also necessary to determine two other questions which enter into the value of the property under all conditions. They are the amount to be allowed for working capital, and for going value.

## "Working Capital.

"The matter of working capital furnishes another illustration of the difficulty of dealing with the situation as applicable to individual companies rather than with the companies in the transfer of gas system as a whole. The Consolidated Company is the parent company, owning and controlling the others, and using its own construction department for major construction work of all the companies. It also contracts in the first instance for the stock of coal and oil required by all companies, and to a very considerable extent for pipe, specials, and other large supply items. This method I think results in economies for all the companies, but to some extent it tends to encourage the carrying of a larger total amount of working capital than would otherwise be needed for the plaintiff's own gas business alone. Although each company pays its own bills, directly to the purveyor, for coal, oil, and pipe for main construction (the three largest items of outlay), the Consolidated Gas Company does carry on hand stocks of certain materials which are subject to use for the aid of affiliated companies (e. g., pipe and specials for repair work done for the Standard and New Amsterdam Companies). As soon as any of these materials are used in the doing of work for any of the affiliated companies, the cost of such work, including labor and materials, is immediately billed to such company and thereupon appears in the 'accounts receivable' of the Consolidated Gas Company.

"In presenting its proofs as to the amount of working capital required for the plaintiff's own gas business, the plaintiff's witnesses properly eliminated all 'accounts receivable' and 'suspense' items due from affiliated companies. On the other hand, the plaintiff's own manufacturing plants produce only about two-fifths of the gas sold, the other three-fifths being purchased; hence the amount of gas sold, standing alone, would not be a proper basis to be used in estimating the amount of working capital. Again, the Astoria Company, which makes gas and sells practically its entire product to the other companies in the system, requires large stocks of gas making materials, but no main and service supplies, and, as it sells substantially all its production to the other companies, has no uncollectible gas bills, such as the distributing companies have. The larger amount of gas-making materials kept on hand by the Astoria Company also tends to reduce the necessity of the other system companies keeping the same in their stocks.

"In the case of the Astoria Company, I think the amount allowed as working capital can be fairly apportioned between it and the other companies for whom it manufactures gas in the proportions that its manufacturing facilities are used for such companies, but this method is not applicable to the plaintiff company. Mr. Brundage, plaintiff's secretary at the time of the hearings, testified that the working capital needed by the Consolidated Company in 1923 was $7,200,000, and by the Astoria Company $3,280,000.

Col. Miller, one of the plaintiff's expert witnesses, testified that the Consolidated Company needed $6,900,000 and the Astoria Company $3,400,000. Mr. Brundage's figures were based on what he testified was the average necessary cash from the standpoint of operating expenses, the quantities of materials required to be kept on hand for the plaintiff's gas business, the advances represented by the average balances due from sundry debtors, the necessity of maintaining credit, the necessity of discounting bills, and similar factors which enter into business judgment and actual necessities as to working capital. A similar method was pursued as to the Astoria Company. Col. Miller's method, on the other hand, was based on assuming the requirement of 40 cents per 1,000 cubic feet of gas made and sold by the plaintiff, and 20 cents per thousand cubic feet on the portion of the gas sold which was purchased from other companies. For the Astoria Company he based it on the unit of 20 cents per 1,000 cubic feet of gas sold. Either method produces substantially the same result.

"The defendant Attorney General claims that for the Consolidated Company the allowance for working capital should be $4,811,538.80, which is arrived at on the basis of 20 cents per 1,000 cubic feet of gas sold, and which he thinks sufficient to include the necessities of the Astoria Company. In reference to the Astoria Company, in the joint facilities report, Mr. Woods assumes the amount necessary for that company at $3,319,000 for the year 1922; $3,941,128.45 for the year 1923, of which $2,898,799.17 for 1922, and $3,155,835.71 for the year 1923 was devoted to the service of the Consolidated Company. In view of the increased demands made on the Astoria Company and the increased sales of the Consolidated Company, I think an allowance of $3,500,000 for the Consolidated Company and $3,000,000 for the Astoria Company (of which $2,400,000 is used for the benefit of the Consolidated Company), or $6,500,000 in all, is a fair and reasonable amount, and I so find.

"Going Value.

"In the consideration of this subject, great care should be taken to distinguish between 'going value,' as I think is intended in the cases which say the value should be included in determining the value of the property of a public utility in considering the question of a fair return, and other elements which many writers, both lawyers, economists, and judges, have loosely included therein. In reviewing what has been written on the subject, it is apparent that there have often been grouped under this head items more properly termed 'undistributed structural costs' and 'pioneer losses.' I find no authority in the decisions of the Supreme Court for the inclusion of these items under this head, nor for the inclusion of the latter class at all. Georgia Railway & Power Co. v. Railroad Commission of Georgia, supra. It seems to me that 'going value' is something entirely different and apart from such expenditures. It is not easily expressed in exact language, and its measure and amount must differ in individual cases. I think the statement of Judge Miller in the Kings County Lighting Co. Case, 210 N. Y. 479, 486, 104 N. E. 911, 912, 51 L. R. A. (N. S.) 1, comes very close to being an accurate definition of the term, and the elements entering into it. He there said:

" 'It takes time to put a new enterprise of any magnitude on its feet, after the construction work has been finished. Mistakes of construction have to be corrected. Substitutions have to be made. Economies have to be studied. Experiments have to be made, which sometimes turn out to be useless. An organization has to be perfected. Business has to be solicited and advertised for. In the case of a gas company, gratuitous work has to be done, such as selling appliances at less than a fair profit and demonstrating new devices to induce consumption of gas, and to educate the public up to the maximum point of consumption. None of those things is reflected in the value of the physical property, unless, of course, exchange value be taken, which is not admissible in a rate case. A company starts out with the "bare bones" of the plant, to borrow Mr. Justice Lurton's phrase in the Omaha Waterworks Case, supra. By an expenditure of time, labor, and money, it co-ordinates those bones into an efficient working organism and acquires a paying business. The proper and reasonable cost of doing that, whether included in operating expenses or not, is as much a part of the investment of the company as the cost of the physical property.'

"In the instant case, witnesses have testified to a going value of from $19,000,000 to $27,000,000. These witnesses were men of long connection and great experience in the gas business. They have given their reasons for their opinion and the method in which they arrived at their conclusions as to such value. Weight must be attached to their opinions. But in this case there are features which I think create a difference between the

basis for their testimony and the facts as they actually exist here. They and others base their opinion on the construction of a new enterprise, and the development of its business from its inception into a paying concern. In this case, the present plaintiff took over the established business and properties of certain gas companies in the city of New York, some of which had been incorporated and in operation at the time of the consolidation for a period of over 50 years. A great deal of the work, labor, and outlay incident to the inception of the other companies had been already performed. They had installed over 100,000 meters and were selling in the neighborhood of 4,000,000,000 cubic feet of gas a year. They were doing business, and this present plaintiff has continued to do business in a thickly settled community, the chief city of this country.

"When the consolidation was effected in 1884, these companies were taken over at a value fixed on them which was approved by the Legislature of this state. It is fair to assume that at that time all the elements which properly went into that valuation were given consideration, and among these must have been the value of this element constituting what we now call 'going value.' The Consolidated Gas Company had the benefit of their early efforts, and continued them, and has increased the sales from 4,000,000,000 to 24,000,000,000 cubic feet of gas per year. It has had the control, if not a monopoly, of the gas business in its territory for a number of years, through its ownership of companies otherwise competitors. There was a time when the electric light business threatened its supremacy, and for a time its business fell off materially. However, it secured control of these companies also, and then the increase of the use of gas for domestic and commercial purposes gradually replaced its loss as a lighting medium. In a city such as this, while of course it is necessary and proper that efforts should be made, as they have been, to increase the sales of gas, it is also true that a very considerable portion of its new business comes to it without cost or solicitation. Its position is unique, and differs materially from that of a company seeking to establish a new business in a small and less populated community, where the uses and advantages of gas have not been known and the people must be educated to its use. For these reasons I think that many of the facts, figures, and arguments advanced have no application to the present situation.

"The investment in the properties used by the plaintiff in its gas business on December 31, 1923, approximates $90,000,000. Although no definite percentage has been laid down as representing the measure of the 'going value' of a public utility company, examination of the cases has shown that courts have generally found an amount approximating 10 per cent. of the sum found as the value of the tangible property, as fairly representing the 'going value.' Mobile Gas Co. v. Patterson (D. C.) 293 F. 219; Streator Aqueduct Co. v. Smith (D. C.) 295 F. 385. In some of these instances the sum found as the value of the tangible property has been approximately the investment; in other instances a larger sum determined as the fair value; but the percentage of relationship has generally been about what I have stated. In determining the question of the confiscatory character of the statutory rate, values should be conservative rather than otherwise, in order that the courts may see whether by any fair method such rates can be sustained. I think, therefore, that for the purpose of this suit an allowance of $9,000,000 for 'going value' is reasonable, especially in view of the fact that in all probability some of the elements of 'going value' were included in the amount allowed in its investment on consolidation. I have eliminated them from consideration, as already stated, in reaching this sum.

"In fact, if this were an original question, I might hesitate to rest a decision as to the unconstitutionality of the statute fixing rates because confiscatory, on the inclusion of either going value or the valuation of 'franchises and rights.' As to the latter item, it ordinarily would not be included in a rate litigation (Georgia Railway & Power Co. v. Railway Commission of Georgia, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Cedar Rapids Gas Co. v. Cedar Rapids, 223 U. S. 655, 699, 32 S. Ct. 389, 56 L. Ed. 594; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 169, 35 S. Ct. 811, 59 L. Ed. 1244; Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678), and is only included in the instant case for the reason that as to this particular company the Supreme Court of the United States has allowed them, as it states, 'for special reasons' (Willcox v. Consolidated Gas Co., 212 U. S. 19, 43, 44, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034; Newton v. Consolidated Gas Co., 258 U. S. 165, 42 S. Ct. 264, 66 L. Ed. 538; Georgia Railway & Power Co. v. Railway Commission, supra), which virtually make the allowance of $7,781,000 for 'franchises and rights' unique and sui generis as to this company.

"The element of going value, however, where definitely and sufficiently proved,

seems clearly to be a part of the rate base under Des Moines Gas Co. v. Des Moines, supra, Denver Union Water Case, 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649, Southwestern Bell Telephone Co. v. City of Ft. Smith (D. C.) 294 F. 102, and Venner v. Urbana Water Co. (C. C.) 174 F. 348, even although in the end the amount thereof is not a matter of exact mathematical calculation, but of judgment. In this case, the evidence shows that a business has been created, successfully in operation, with the manufacturing plants organized and operating in a modern, efficient, economical manner, with a personnel co-ordinated and of long experience; that considerable amounts have been and are being expended annually in advertising the advantages of the use of gas and gas appliances, in the instruction of consumers in their use, in devising new methods of applying its use to domestic and commercial purposes, and in bringing such methods to the attention of present and prospective customers, in canvassing and soliciting business, in making tests and experimentation of new devices, and in other ways doing many and various things to attract new customers and extend the demands of old ones. It is true that the company has, to a certain extent, been reimbursed for its expenditures in extending its business, but that has been held no reason for not considering them as elements in 'going value.' Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 267, 39 S. Ct. 454, 63 L. Ed. 968; City of Minneapolis v. Rand (C. C. A.) 285 F. 819, 830; Kings County Lighting Co. Case, 210 N. Y. 479, 486, 104 N. E. 911, 51 L. R. A. (N. S.) 1.

"I think a clear distinction is shown here between them and elements such as past losses, good will, development, or undistributed structural expenses. Elements of going value are certainly above and beyond those mentioned, and do exist in the present case. I am now able to proceed to find the amount of the investment in the property of the plaintiff and in that portion of the property of other companies used by it for the benefit of its consumers. I find the investment cost of the portion of the tangible property of the Consolidated Gas Company used by it in its gas business as of December 31, 1922, was the sum of $49,225,798.32; franchises and rights $7,781,000; working capital $3,500,000; going value $9,000,000—total, $69,506,798.32.

"The original cost of the Astoria Light, Heat & Power Company's property used and useful in the gas business as of December 31, 1922, as shown by its books of account, exclusive of working capital, was at least the

sum of $25,769,744.29. Of the above amount mentioned the portion devoted to the plaintiff in its gas business amounted to the sum of $22,507,174.83; working capital, $2,550,000; portion devoted to the plaintiff's gas business was $2,227,158.14—total, $24,734,332.97. The investment of the Standard Gaslight Company in the jointly used property, as of December 31, 1922, amounted to the sum of $451,673.26, of which the portion used by the plaintiff amounted to the sum of $180,409.02. The investment in the jointly used property of the East River Gas Company of Long Island City amounted to the sum of $6,723,687.64, of which the portion used by the plaintiff amounted to the sum of $4,139,587.09. This makes the total investment in the property of the plaintiff and that of the other property used by it as of December 31, 1922, as follows:

| | |
|---|---|
| Property of Consolidated Gas Company | $69,506,798.32 |
| Property of the Astoria Light, Heat & Power Company | 24,734,332.97 |
| Property of the Standard Gaslight Company | 180,409.02 |
| Property of the East River Gas Company of Long Island City | 4,139,587.09 |
| Total | $98,561,127.40 |

"I find that the cost of the portion of the property of the Consolidated Gas Company used by it in its gas business as of June 1, 1923, was the sum of $51,297,363.44; franchises and rights, $7,781,000; working capital, $3,500,000; going value, $9,000,000—total, $71,578,363.44. The original cost to the Astoria Light, Heat & Power Company of its property used and useful in its gas business as of June 1, 1923, as shown by its books of account, exclusive of working capital, was at least the sum of $26,136,953.16; working capital, $3,000,000—total, $29,136,953.16. Of the above-mentioned amount, the portion devoted to the plaintiff in its gas business amounted to the sum of $23,331,245.86. The investment of the Standard Gaslight Company in the jointly used property, as of June 1, 1923, amounted to the sum of $473,750.04, of which on the basis of the Woods report, the proportion used by the plaintiff, amounted to the sum of $187,155.99. The investment in the jointly used property of the East River Gas Company of Long Island City amounted, as of June 1, 1923, to the sum of $6,723,319.52, of which 'the portion used by the plaintiff amounted to $3,795,038.34. This makes the total investment in the useful property owned by the plaintiff and in the property of other companies used by it, as of June 1, 1923, as follows:

Property of the Consolidated Gas
Company ..................$71,578,363.14
Property of the Astoria Light,
Heat & Power Company...... 23,331,245.86
Property of the Standard Gaslight
Company ................... 187,155.99
Property of the East River Gas
Company of Long Island City.. 3,795,038.34

Total ..................$98,891,803.63

"During the period from June 1, 1923, to December 31, 1923, the books of account in evidence show that the plaintiff expended for additions, extensions, and improvements in and to its gas properties (including $500,-000 of its investment in the Hunts Point property) the sum of $2,532,895.35, and during the same period it made retirements amounting at the original cost of such property (including the Fourteenth and Forty-Second street stations) to $2,843,496.84, making a net decrease from the original cost of the plaintiff's gas property during this period of $310,601.49. During the same period, viz. from June 1 to December 31, 1923, the Astoria Light, Heat & Power Company expended for additions, extensions, and improvements the sum of $708,526.91, and made retirements during said period amounting to $29,558.55, making net additions applicable to the investment of the company during that period of $678,968.36, of which the proportion devoted to the requirements of the plaintiff in the service of its consumers amounted to the sum of $336,768.50. During this period there were no additions or retirements to the jointly used properties of the Standard or East River gas companies. This makes the investment as of December 31, 1923, the sum of $98,917,970.64, made up as follows:

Original cost of the property used
in plaintiff's gas business as of
June 1, 1923................$98,891,803.63
Net decrease in such property and
investment June 1, 1923, to De-
cember 31, 1923............. 310,601.49

Total of property used in the
plaintiff's gas business as of De-
cember 31, 1923.............$98,581,202.14
Net additions to December 31,
1923, in the property of the As-
toria Light, Heat & Power
Company used in the plaintiff's
gas business................ 336,768.50

Total investment as of December
31, 1923, in property used in
the plaintiff's gas business.....$98,917,970.64

"Reproduction Cost.

"In reference to the reproduction cost of plaintiff's property and that of the other companies used by it in the service of its consumers, it must be borne in mind that the defendants offered no testimony on this subject, resting on the legal contention that it furnished no evidence of value, and that the proper basis was the investment cost alone. There was some attempt on cross-examination to show that the figures given were not entirely correct, but no witnesses were produced to contradict the plaintiff's evidence. This does not, however, apply to the value ascribed to the land nor the Astoria tunnel, as to which, as before stated, they did present witnesses. If all the evidence produced by the defendant Attorney General as to the land was accepted at its face value, it would make but a very slight difference in the amount of reproduction cost as testified to by the plaintiff's witnesses.

"The defendants do ask that, from what has been done or said in other cases, different conclusions be drawn or less amounts found than testified to by the plaintiff; but, except as to the Astoria tunnel, no legal evidence has been presented, in behalf of the Attorney General or by the Public Service Commission, which might be weighed against that presented in behalf of the plaintiff company. Presumptively, the commission and the Attorney General have performed their sworn duty as public officers. Actually, I have no reason to believe that they have done less, with respect to the preparation and presentation of proofs in this case. I have no reason to believe that either the commission or the Attorney General refrained from presenting any testimony in fact available to demonstrate that any of the plaintiff's figures were excessive, assuming the correctness of the controverted legal principles on which the plaintiff's proofs were based.

"The plaintiff has presented the sworn testimony of Mr. Burt, head of the Northeastern Construction Company, as to the cost of replacing the structures used by the plaintiff for the benefit of its consumers in the condition in which they were when new, and also an estimate of the amount which would be required to put the present structures in that condition. Col. Miller, a gentleman of long experience in the construction and operation of gas properties, has presented an inventory of the equipment and machinery, and given an estimate of its present reproduction cost, together with the amount necessary to put the same in condition as if new. Mr. Simpson, who has been the engineer in charge of mains and services for many years, has testified as to his opinion of the cost of reproducing the present mains and services,

or such portion of them as plaintiff uses, and as to their condition. The value of land has been testified to by various witnesses. Other property has been set forth at its book value. Testimony was also presented by Col. Miller as to the undistributed structural costs claimed by the plaintiff to be necessarily a part of the reproduction of the property used by it in the gas business.

"The opinions of these witnesses, coming as they do from men of long experience in their respective lines, are entitled to great weight, but are not necessarily conclusive, any more than opinion evidence on any other subject. It must be taken and considered in the light of all the facts in the case, the past experience of the company, the evidence as to present prices, and the difference in cost between what might be called the pre-war period and the present period, and all the other facts and circumstances in the case which tend to bear on the determination of these costs by the special master.

"After giving due consideration to all these factors, I have reached the conclusion that it would cost to reproduce the manufacturing plant, distributing system, and other tangible property owned by the plaintiff and used and useful in its gas business as of December 31, 1922, inclusive of certain property owned by the plaintiff, but used jointly with other companies, exclusive of working capital and going value, and without any deduction for so-called depreciation, but after deducting the sum hereinafter stated in order to place the property in condition as if new, at least the sum of $113,282,044.64. Deducting therefrom the portion thereof used by other companies, the reproduction cost of which was the sum of $5,171,911.58, makes the reproduction cost of the tangible property owned by the plaintiff and used by it in its gas business at least the sum of $108,110,133.06.

"As to the Astoria Light, Heat & Power Company I find the reproduction cost of its property, as of December 31, 1922, to have been at least the sum of $29,762,268.36, made up as follows:

Reproduction cost of property. used by plaintiff..............$22,352,668.24
Less percentage of amount necessary to put property in condition when new..............  510,879.98

Making ................$21,841,788.26
Undistributed structural costs...  5,520,380.10
Working capital..-..............  2,400,000.00

Total reproduction cost, at least  ................$29,762,268.36

"As to the East River Gas Company of Long Island City, I find that the reproduction cost of its property used by the plaintiff as of December 31, 1922, was at least $8,993,261.76, made up as follows:

Astoria tunnel..................$5,540,488.09
Ravenswood tunnel.............  738,674.62
48 and 60-inch mains in Long Island City and Astoria..........  653,663.19
Undistributed structural costs....  2,060,435.86

Total, at least.............$8,993,261.76

"As to the Standard Gaslight Company, I find that the reproduction cost of the portion of its property used by plaintiff as of December 31, 1922, was at least $345,087.55, made up as follows:

48-inch Harlem River main........$207,718.42
Sixty-Second street boiler and governor house...................  60,502.83
Undistributed structural costs.....  76,866.30

Total, at least...............$345,087.55

"This makes the total reproduction cost of the property of the plaintiff and of the portion of the jointly used property used by the complainant in its gas business as of December 31, 1922, including working capital and going value, at least the sum of $159,710,750.73, made up as follows:

Property of Consolidated Gas Company ..................$108,110,133.06
Working capital of Consolidated Gas Company..............  3,500,000.00
Going value of Consolidated Gas Company ..................  9,000,000.00

Total ................$120,610,133.06
Property of Astoria Light, Heat & Power Company..........  29,762,268.36
Property of East River Gaslight Company of Long Island City  8,993,261.76
Property of the Standard Gaslight Company..............  345,087.55

Total reproduction cost of the property used by the plaintiff as of December 31, 1922, at least......$159,710,750.73

"I have reached the conclusion that it would cost to reproduce the manufacturing plant, distributing system, and other tangible property owned by the plaintiff and used and useful in its gas business as of June 1, 1923, inclusive of certain property owned by the plaintiff and used jointly with other companies, exclusive of working capital or going value, without any deduction for so-called depreciation, but after deducting the sums hereinafter stated in order to place the property in condition as if new, at least the sum of $113,642,391.54.

"Certain of this property, however, was used by other companies, including the 48-

inch connecting main in Manhattan and the Bronx, the 48-inch transfer main, and the 36-inch distributing mains in the Bronx and the Kingsbridge holder station and certain small mains in the Bronx, and the cost to reproduce such portion as of June 1st was the sum of $3,243,676.43. This makes the reproduction cost of the tangible property owned by the plaintiff and used by it in its gas business at least the sum of $110,398,-715.11.

"I have found the cost to reproduce the portion of the manufacturing plant, distributing system, and other tangible property owned by the Astoria Light, Heat & Power Company, but used by and useful to the plaintiff in its gas business, as of June 1, 1923, inclusive of working capital, to be at least the sum of $31,041,333.66. This is without any deductions for so-called depreciation, but after deducting the percentage of the amount necessary to put the property of such company in condition as when new. This amount is made up as follows:

Reproduction cost of property.. $23,265,043.05
Less percentage of amount nec-
  essary to put buildings and
  plant in condition as when new     468,392.19
                                   ─────────────
    Making .................$22,796,650.86
Undistributed structural costs...  5,844,682.80
Working capital................  2,400,000.00
                                 ─────────────
    Total, at least............$31,041,333.66

"I have also found the reproduction cost of the portion of the property of the East River Gas Company of Long Island City used by the plaintiff as of June 1, 1923, to be at least the sum of $8,266,253.52, made up as follows:

Astoria tunnel...................$5,086,537.80
Ravenswood tunnel................   678,127.61
48 and 60 inch mains in Long Is-
  land City and Astoria..........   600,846.31
Undistributed structural costs....  1,900,741.80
                                  ─────────────
    Total, at least............$8,266,253.52

"I have also found the reproduction cost of that portion of the jointly used property of the Standard Gaslight Company used by the plaintiff as of June 1, 1923, to be at least the following sum:

48-inch Harlem River main.......$190,692.32
Sixty-Second street boiler and gov-
  ernor house....................    85,146.37
Undistributed structural costs......  77,551.50
                                   ───────────
Total reproduction cost of property
  of Standard Gaslight Company
  used by the plaintiff, at least......$353,390.19

"This makes the total reproduction cost of the property of the plaintiff and of the portion of jointly used property used by the

plaintiff in its gas business as of June 1, 1923, including working capital and going value, at least the following amounts:

Property of Consolidated Gas
  Company ..................$122,898,715.11
Property of Astoria Light, Heat
  & Power Company..........   31,041,333.66
Property of the Standard Gas-
  light Company..............      353,390.19
Property of the East River Gas
  Company of Long Island City    8,266,253.52
                               ──────────────
Total reproduction cost of prop-
  erty used by the plaintiff in its
  gas business as of June 1,
  1923, at least the sum.......$162,559,692.48

"During the period from June 1, 1923, to December 31, 1923, the plaintiff made additions, extensions, and improvements to its properties which should be added to the reproduction cost thereof as of June 1, 1923, such capital additions, amounting to $2,137,-906.17. The withdrawals during the same period, including the Fourteenth and Forty-Second street stations at unit prices as of June 1, 1923, amounted to $9,712,031.53, making a net decrease during this period, applicable to the reproduction cost of the plaintiff's used and useful property of $7,-574,125.36.

"Taking into consideration these changes, the reproduction cost of the property owned by the plaintiff and used in its gas business as of December 31, 1923, was and is at least the sum of $115,324,589.75. During the same period the Astoria Light, Heat & Power Company made certain net additions to its property devoted to the use of the plaintiff amounting to the sum of $80,066.73, making the value of the property of that company used by the plaintiff in its gas business as of December 31, 1923, at least the sum of $31,-121,400.39. This makes the reproduction cost of the property used by the plaintiff in its gas business, including working capital and going value, at least the following sums, as of December 31, 1923:

Property of Consolidated Gas
  Company ..................$115,324,589.75
Astoria Light, Heat & Power
  Company ..................   31,121,400.39
Standard Gaslight Company....      353,390.19
East River Gas Company of
  Long Island City............    8,266,253.52
                               ──────────────
    Total, at least..........$155,065,633.85

"In connection with this finding of reproduction costs, aside from certain reductions in the estimated cost of the manufacturing plants and holder stations, the principal difference will be found in the value of street mains, services, and undistributed structural costs. The street mains Mr. Simpson ap-

praised at the sum of $37,075,233, and the services at $5,557,284. The former had cost the plaintiff $13,531,095.10 and the latter, $1,971,101.26. It will be observed, therefore, that Mr. Simpson's appraisal gives a June 1, 1923, reproduction cost of mains of nearly 3 times the company's investment therein, and of the services' of about 2½ times. It is true, undoubtedly, that to reproduce the mains and services under conditions as they exist to-day in the borough of Manhattan would. cost a very considerable amount in excess of the cost of their original installation, but that it would be so great an increase as above stated does not accord with my opinion of the general increases of costs of labor and material, nor with my judgment on the facts in relation thereto as presented in the testimony. While the generally accepted increase over pre-war prices of labor and materials is some 60 per cent., it is true that in the case of mains particularly the great increase of underground structures in the borough of Manhattan in the last 15 or 20 years has added considerably to the cost of installation.

"It seems to me, however, that if we accord substantially 100 per cent. increase over the original cost these difficulties, as well as the increased cost of labor and material, are taken into consideration. I have great respect for Mr. Simpson's knowledge and the detail with which he has worked out his estimates, but after all it is an estimate based on what he calls average conditions encountered in the borough of Manhattan, and it seems to me that he has overestimated the cost of meeting such conditions, or has taken a condition as an average one which is more costly than what the cost would. be based on the actual construction of the mains themselves.

"For the same reasons substantially I have reduced the estimate as to the replacement cost of the services. I have included in my estimate of the reproduction cost an amount for undistributed structural costs, which it seems to be generally conceded necessarily accompany any undertaking of size such as this would be, but at an amount different from that testified to. I have computed this amount on a basis which is approximately the amount allowed by the Public Service Commission in this state and by other public utility bodies, and which I think should fairly cover the cost of such items.

## "Present Value.

"Having reached a conclusion as to the investment in and the reproduction cost of the property of the plaintiff and of the portion of the jointly used property of other companies used by the plaintiff in its gas business for the benefit of his consumers, I have taken up the question of the present value of such properties. Under the rule laid down by the United States Supreme Court in its latest decisions on the subject, as I understand them, preponderating weight is to be given to the reproduction costs; but no decision that I have found states that that is to be the sole basis for the finding of present value. Nor do I find any decision upholding the contention of the defendants that the original or investment cost is to be the sole basis for determining the present value.

"As I have before stated, the difficulty lies in the fact that the Supreme Court has laid down no definite rule as to how much or exactly what weight is to be given to either of these factors. The question of return can only affect the result, if it were not to be varied in accordance with the facts as found by the commission or courts, and the value of its stocks and bonds as heretofore stated, at least in this particular case, can have no weight owing to the ownership by the plaintiff of and the receipt of return from both gas and electric business. Therefore, not all of the elements laid down in Smyth v. Ames can be applied to the present case.

"There are, however, certain facts and considerations that are of weight in determining this question. The investment of the plaintiff in the properties used by it in its gas business, inclusive of franchises, working capital, and going value as of December 31, 1922, was at least the sum of $98,561,127.40; as of June 1, 1923, was.at least the sum of $98,891,803.63; and as of December 31, 1923, at least the sum of $98,917,970.64. Its reproduction cost on December 31, 1922, was at least the sum of $159,710,750.73; on June 1, 1923, was at least the sum of $162,559,-692.48; and on December 31, 1923, was at least $155,065,633.85.

"In the gas rate litigation of 1919–20, Judge Hand found an investment value at that time (1918) of at least $64,196,533, exclusive of 'franchises and rights' and going value, and with a working capital of only $2,000,000 (although he stated that defendants' witnesses had said that 20 cents a 1,-000 cubic feet was the minimum amount which should be allowed for it, which would have given $3,800,000 as the proper working capital at that time on such basis). He stated this investment finding of at least $64,-196,533 was 'certainly too small,' that it was

'more than probable that plaintiff's whole investment at present prices was valued at $115,000,000,' twice what he valued it at. This figure was arrived at after excluding practically everything defendants objected to, and cutting all values to the lowest possible figure, as he stated.

"Since the presentation of proofs in that case, the present investment in the various properties valued by Judge Hand, adding other properties now used by plaintiff in its gas business, has increased from $64,196,533 to at least $78,273,856.52 as of December 31, 1923, exclusive of working capital in excess of $2,000,000, and exclusive of going value and franchises. If the then present value of the properties included by Judge Hand in 1918 was $115,000,000 at that time, and $14,-000,000 has been added to it since then, it would make a present value of at least $129,-000,000, plus the additional working capital I have found now necessary, and plus 'franchises and rights' and going value. Adding the working capital and franchises would make a value, exclusive of going value, of at least $140,281,000 at present prices, or, with going value included, of at least $149,281,-000.

"Again, Judge Hand, in finding that his computation produced a capitalization of only $3.36 per thousand cubic feet, or $3.63 with franchises, stated that it was too small, and that defendants' experts had sworn that at that time the cost of a water gas plant would be $5.60 per 1,000 cubic feet, and that coal gas plants would cost more. Col. Miller in the present case swore that the cost of a coal gas plant would be twice that of a water gas plant. It thus appears that Judge Hand practically conceded that he had valued the plants at only a little over one-half a figure which he would have been justified by the testimony in the case in finding as its then value.

"We thus have various amounts presented under various conditions as representing the conflicting views of the plaintiff and defendants, the plaintiff contending for the full current reproduction cost with the engineering estimates of the undistributed structural costs and various proofs as to working capital and going value, which amounts to $216,-153,025.31 as of June 1, 1923, and to $209,-711,006.51 as of December 31, 1923, and the investment, which the defendant Attorney General claims is the sum of $94,366,337.13 or, including franchise value of $7,781,000, the sum of $102,147,337.13. The defendants also claim that no going value should be included, but if this be given the value assigned by the special master it would bring the investment on the defendant Attorney General's basis to the sum of $111,147,337.13.

"It was stated by Mr. Justice Peckham in Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, 29 S. Ct. 192, 200 (53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034), that present value was the basis on which the company was entitled to a return. He there stated 'If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase. This is, at any rate, the general rule. We do not say there may not possibly be an exception to it, where the property may have increased so enormously in value as to render a rate permitting a reasonable return upon such increased value unjust to the public.' On the other hand, it has never been held that the protection of the constitutional guaranty was limited to the amount originally invested in property devoted to the public service; on the contrary, the Supreme Court has repeatedly declared that the protection extends to the value of the property at the time of the alleged confiscation.

"Bearing in mind these various claims and controverted questions, and applying to the evidence various well-accepted theories as to the difference between former and present costs, I have arrived at an estimate of the present value of the property as of June 1, 1923, as at least the following sums:

Consolidated Gas Company.

| | |
|---|---|
| Land | $ 13,460,000.00 |
| Buildings | 8,000,000.00 |
| Manufacturing plants and holder stations | 16,000,000.00 |
| Mains | 27,000,000.00 |
| Services | 3,000,000.00 |
| Meters and gas appliances | 11,500,000.00 |
| General equipment | 831,523.00 |
| Tools and implements | 202,363.00 |
| Laboratory equipment | 23,905.00 |
| Working capital | 3,500,000.00 |
| Franchises | 7,781,000.00 |
| Undistributed structural costs as shown by books | 2,248,319.61 |
| Going value | 9,000,000.00 |
| Total, at least | $102,547,110.61 |
| Less value of property used by other companies | 3,243,676.43 |
| Present value of the property, as of June 1, 1923, used in the plaintiff's gas business, at least | $ 99,303,434.18 |

Astoria Light, Heat & Power Company (Portion Used by Plaintiff).

| | |
|---|---|
| Land | $ 3,277,297.44 |
| Buildings | 4,000,000.00 |
| Manufacturing plant and holders | 16,000,000.00 |
| Concrete bulkhead | 141,092.46 |
| Furniture and fixtures | 41,279.17 |
| General equipment | 43,883.99 |
| Tools and implements | 114,992.00 |
| Working capital | 2,400,000.00 |
| Undistributed structural costs found on the books | 2,408,332.00 |
| Total, at least | $28,426,877.06 |

East River Gas Company (Portion Used by Plaintiff).

| | |
|---|---|
| Astoria tunnel | $4,374,557.41 |
| Head houses | 74,406.42 |
| Land | 4,459.23 |
| Mains and equipment | 500,000.00 |
| Total, at least | $4,953,423.06 |
| Ravenswood tunnel | $ 504,312.53 |
| Land | 29,451.86 |
| Head houses | 34,240.08 |
| Equipment and mains | 100,000.00 |
| Total, at least | $ 668,004.47 |
| 48 and 60-inch mains | 525,000.00 |
| Total, at least | $6,146,427.53 |

Standard Gaslight Company (Portion of Property Used by Plaintiff).

| | |
|---|---|
| 48-inch Harlem River main | $150,000.00 |
| Sixty-Second street boiler and governor house | 75,000.00 |
| Total, at least | $225,000.00 |

"Making the total amount as of June 1, 1923, at least the following sums:

| | |
|---|---|
| Consolidated Gas Company | $ 99,303,434.18 |
| Astoria Light, Heat & Power Company | 28,426,877.06 |
| East River Gas Company of Long Island City | 6,146,427.53 |
| Standard Gas Light Company | 225,000.00 |
| Total, at least | $134,101,738.77 |

"The additions and withdrawals between June 1, 1923, and December 31, 1923, would reduce this amount as of December 31, 1923, to $129,760,683.77, on at least which amount the plaintiff is entitled to receive a reasonable return over and above the actual and reasonable costs of production and distribution of the gas supplied by the plaintiff to its consumers.

"In arriving at these figures I have taken into consideration the testimony as to the present condition of the property, its efficiency and operating results, as well as fact that as to a certain portion of the property it has been added during the period of comparatively high prices, which do not differ much from the present level. As to the part representing the investment prior to December 31, 1915, I have added what seems to me to be the appreciation generally agreed on as having occurred between that date and this time. The result thus obtained in connection with the other facts and figures presented in the exhibits and evidence has checked to my satisfaction the amount stated above as being the present value.

### "Gas Unaccounted For.

"The item of 'unaccounted-for' gas represents the difference between the gas sent out from the plants and the gas sold to consumers or used by the company itself. It is the lost gas, due to a variety of causes, such as condensation in mains, leakages in main and service pipes, slow consumers' meters, and variations in the temperature between the point of registration at the plant where made and at the meters on consumers' premises where it is measured for consumption. In 1922 the gas unaccounted for of the plaintiff amounted to 6.42 per cent.; in 1923, to 4.3 per cent. For the system it was 6.56 in 1922, and 4.64 in 1923. Natural causes contributed principally to the increase in 1922 over what had been the average loss of something over 4 per cent. This is a very low percentage; I think, with only one or two exceptions, the lowest in any city in this country. The defendants do not dispute this amount, and I have therefore taken it at these figures in my computations of the cost of gas sold.

### "Cost of Operation.

"Testimony has been presented showing the claimed cost of operation of the various units at Astoria on the assumption that it was a manufacturing plant of the plaintiff; of the cost of the gas sold by the plaintiff, including the cost of gas made by its own plants on Manhattan Island, and the cost of gas purchased by it; and the cost of the gas manufactured and sold by the system as a whole for the years 1922 and 1923, and an estimate of the cost of making such gas for the nominal year April 1, 1924, to April 1, 1925. No question is raised by the defendants as to the fact that the amounts claimed by the plaintiff were actually expended, nor that the materials and labor were actually used. The defendants urge, however, that the following items of the plaintiff's operating expenses, for the year 1923, should be excluded (this schedule being a direct transcript from page 159 of the Attorney General's brief):

1923

Account—Salaries, General Office:
Salaries of general officers and costs of maintaining accounting department, transfer department, and cashier's department .................\$    89,789.36
Account—Supplies and Expenses, General Office:
Preferred stock department....    90,096.43
Same proportion of balance in account after deducting preferred stock department which deduction account Salaries General Office bears to total of that account................    37,146.15
Account—General Law Expenses:
One-third ...................    16,559.70
Account—Miscellaneous General Expenses:
One-third of meeting fees......    6,196.66
Special expenses included......    21,003.94
Account—Gas Supply Inspection..    100,101.06
Account—Expenses Gas Rate Appeal No. 3.................    86,458.06
Account—Expenses re Public Service Hearings...............    113.56
Account—Insurance:
Insurance on Fourteenth and Forty-Second street plants...    4,300.00
Account—Taxes:
Deduction on gross earnings tax due to basing it on dollar rate, instead of rate collected in 1923 .....................    10,710.97
Excess dividends tax..........    48,805.41
Real estate tax on property not used and useful:
Fourteenth street manufacturing plant ..........\$59,581.30
Forty-Second street manufacturing plant .......... 90,146.00
Kingsbridge holder one-third ....... 1,826.66
                                    151,553.96
Account—Use of Distributing System:
Difference between amounts shown in Mr. Teele's Exhibit 816, \$474,535.49 (including a return of 8 per cent.) and maintenance of all tunnels and mains jointly used, \$278,796.97 ......................    195,738.52
Account—Uncollectible Bills......    110,734.41
Account—Interest on Consumers' Deposits ..................    94,032.42
Account—Interest on Unpaid Taxes ......................    115,042.57

Total ...................\$1,178,383.18
From this there should be deducted the interest on bank balances credited against the expenses by Mr. Teele.........    58,638.74

Net amount which defendants claim should be deducted.....\$1,119,744.54

"I have assumed that the defendants made the same objection to the items under similar heads for the year 1922. For the purposes of this inquiry, I have eliminated from the plaintiff's actual operating expenses for the years 1922 and 1923, the following items, which items I have disallowed solely for the purpose of testing the statute, and not as a finding of fact that the expenses in question were not reasonable and proper, or that such items should be excluded in the fixation of a fair rate:

Items Deducted from Plaintiff's 1922 Operating Expenses.

Gas supply inspection...........\$    96,096.09
Interest on consumers' deposits..    97,823.80
Rate case expenses.............    30,855.54
Expenses of Public Service Commission hearings..............    43,491.65
Use of manufacturing capacity (representing return on investment) ...................... 2,049,833.70
Use of distributing system (representing return on investment)..\$345,599.70
Less revenue applicable to same........... 2,363.17
                                    343,236.53
Renewals and replacements......    176,378.81
Deduction of gross earnings tax to amount based on a dollar rate instead of rate collected in 1922    24,457.25
Excess dividends tax............    28,368.23
One-third of real estate tax on Kingsbridge land..............    1,833.33
Real estate of corporations tax...    334,965.00
Federal income tax.............    312,357.90
Interest on unpaid taxes.........    129,141.00

                                    \$3,668,838.83

Items Deducted from Plaintiff's 1923 Operating Expenses.

Gas supply inspection...........\$    100,101.06
Interest on consumers' deposits..    94,032.42
Rate case expenses.............    86,458.06
Expenses of Public Service Commission hearings..............    113.56
Use of manufacturing capacity (representing return on investment) ...................... 1,903,264.70
Use of distributing system (representing return on investment)..\$318,575.55
Less revenue applicable to same........... 2,257.84
                                    316,317.71
Renewals and replacements......    53,960.53
Deduction of gross earnings tax, basing it on \$1 rate, instead of rate collected in 1923 ......    12,856.63
Excess dividends tax............    48,805.41
One-third of real estate tax on Kingsbridge land..............    1,826.66
Interest on unpaid taxes.........    115,042.57

                                    \$2,732,779.31

"Although I have deducted the expenses of rate cases and of Public Service Commission hearings and other items mentioned, as seems proper on an inquiry of this kind and has been done in previous rate cases, I perhaps

should say that these items should properly be included in fixing a rate by a body charged with that duty. In fact, it may be that I have been unduly exacting in deducting the cost of rate cases and public service hearings, even on this inquiry. Judge Winslow indicated, in reviewing my report in the New York & Queens Gas Co. Case, that, if the margin of confiscation in that case had been closer on the facts, he would not have hesitated to revise my report and restore this substantial item to operating expenses.

"While it has been assumed generally that such expenses are not of regular or ordinary occurrence, the plaintiff's testimony showed that, so far as the plaintiff is concerned, such expenses have been almost continuous for the past five years, and will continue for at least another year or two. In such time they have cost the plaintiff $730,114.29, and added .0071 cents per 1,000 cubic feet to the cost of operation, which in turn must be borne by the consumers. However, I have felt that this feature is one which might properly be left to the court, to be dealt with in the light of such experience.

"I have decided to treat the cost of operation on the basis as if the used properties of the Astoria and other companies were owned by the plaintiff, and eliminate all intercompany charges, and taking the cost of making all gas sold by the company by consolidating the cost of production of all such gas with the cost of distribution, and in that way arriving at the total cost of production and distribution of such gas. Under this method, and with the elimination of the items above set forth as they appear for both years, I find that the total cost of the production of all the gas made and purchased by the plaintiff for the year 1922 was the sum of at least $11,275,662.90, or at least 51.09 cents per 1,000 cubic feet made. The unaccounted-for gas being 6.42 per cent. makes the cost of production of the gas sold at least 54.79 cents per 1,000 cubic feet. The elimination of the items of distribution I have set forth reduced the cost of distribution from $6,522,119.55, or 31.69 cents per 1,000 cubic feet, to at least $6,253,852.47, or at least 30.39 cents per 1,000 cubic feet. The tax items, the interest on unpaid taxes, and retirement expense omitted reduces these accounts to the extent of $1,007,501.52, making the total cost of production, distribution, etc., at least $20,121,452.47, or at least 97.77 cents per 1,000 cubic feet. I have also eliminated from the miscellaneous operating revenues interest on bank balances, which reduces this item from $1,964,104.77 to $1,916,924.48, or 9.31 cents per 1,000 cubic

feet, and makes net operating expenses of at least $18,204,527.99, or at least 88.46 cents per 1,000 cubic feet.

"The sales of gas for the year 1922 amounted to 20,580,285,600 cubic feet; but, as 117,601,700 cubic feet were for lighting municipal buildings, for which the rate was 75 cents per 1,000 cubic feet, the total receipts, assuming the $1 rate for general consumers to have been in effect, would have been $20,550,885.17, or 99.86 cents per 1,000 cubic feet. This left a net income of not more than $2,346,357.18, or 11.40 cents per 1,000 cubic feet, on the basis of the quantity of gas actually furnished. On the basis of 650 B.t.u. gas, as prescribed by chapter 899 of the Laws of 1923, the cost of operation would have been increased at least $648,279, or 3.15 cents per 1,000 cubic feet, and the net income decreased to not more than $1,698,078.18, or 8.25 cents per 1,000 cubic feet sold.

"I find that the total cost of the production of all the gas made and purchased by the plaintiff for the year 1923 was at least the sum of $12,099,219.79, or at least 47.97 cents per 1,000 cubic feet made. The unaccounted-for gas being 4.31 per cent., the cost of production of the gas sold was at least 50.29 cents per 1,000 cubic feet. The elimination of the items of distribution I have set forth reduces the cost of distribution from $6,921,709.56, or 28.77 cents per 1,000 cubic feet, to not more than $6,641,004.46, or 27.61 cents per 1,000 cubic feet. The tax items, the interest on unpaid taxes, and retirement expense omitted reduces these accounts $232,491.80, making the total cost of production, distribution, etc., at least $21,992,795.27, or at least 91.42 cents per 1,000 cubic feet. I have also eliminated from the miscellaneous operating revenues interest on bank balances, which reduces this item from $2,098,518.06 to $2,039,879.32, or 8.48 cents per 1,000 cubic feet, and makes net operating expenses of at least $19,952,915.95, or 82.94 cents per 1,000 cubic feet.

"The sales of gas for the year 1923 amounted to 24,057,694,200 cubic feet, but, as 130,388,700 cubic feet was for lighting municipal buildings, for which the rate was 75 cents per 1,000 cubic feet, the total receipts, assuming the $1 rate for general consumers to have been in effect, would have been $24,025,097.03, or 99.86 cents per 1,000 cubic feet. This left a net income of not more than $4,072,181.08, or 16.92 cents per 1,000 cubic feet. On the basis of 650 B.t.u. gas, as prescribed by the statute, the cost of operation would have been increased at least $1,248,594.33, or 5.19 cents per 1,000 cubic

feet, and the net income decreased to not more than $2,823,586.75, or 11.73 cents per 1,000 cubic feet sold.

"I find that the total cost of production of all the gas made and purchased by the plaintiff for the year 1923, on the basis of prices of May, 1924, was at least the sum of $11,656,173.40, or at least 46.21 cents per 1,000 cubic feet made, The unaccounted-for gas being 4.31 per cent., the cost of production of the gas sold was at least 48.45 cents per 1,000 cubic feet. The elimination of the distribution items I have set forth reduces the cost of distribution from $6,921,709.56, or 28.77 cents per 1,000 cubic feet, to not more than $6,641,004.46, or 27.61 cents per 1,000 cubic feet. The tax items, the interest on unpaid taxes, and retirement expense omitted reduced these accounts $232,491.80, making the total cost of production, distribution, etc., at least $21,549,748.88, or at least 89.58 cents per 1,000 cubic feet. I have also eliminated from the miscellaneous operating revenues interest on bank balances, which reduces this item from $2,098,518.06 to $2,039,879.32, or 8.48 cents per 1,000 cubic feet, and makes net operating expenses of at least $19,509,869.56, or at least 81.10 cents per 1,000 cubic feet.

"The sales of gas for the year 1923 amounted to 24,057,694,200 cubic feet, but, as 130,388,700 cubic feet were for lighting municipal buildings, for which the rate was 75 cents per 1,000 cubic feet, the total receipts, assuming the $1 rate for general consumers to have been in effect, would have been $24,025,097.03, or 99.86 cents per 1,000 cubic feet. This left a net income of not more than $4,515,227.47, or not more than 18.76 cents per 1,000 cubic feet. On the basis of 650 B.t.u. gas, as prescribed by statute, the cost of operation as of May, 1924, prices, would have been increased at least $1,207,696.25, or 5.02 cents per 1,000 cubic feet, and the net income would have been decreased to not more than $3,307,531.22, or 13.74 cents per 1,000 cubic feet sold.

"During the same period, and on the same basis of prices and elimination, it cost the Consolidated System Companies for the production and distribution of gas sold by them, and they had net income as follows:

| Year. | Costs, Cents per M. | Net Income. | Cents per M. |
|---|---|---|---|
| 1922 | 85.89 | $4,716,593.84 | 13.96 |
| 1923 | 82.63 | 6,426,725.26 | 17.22 |
| 1923 (at present prices).. | 80.76 | 8,756,947.67 | 19.09 |

"On the basis of supplying gas of not less than 650 B.t.u., as prescribed by the statute, the result would have been as follows:

| Year. | Operating Costs, Cents per M. | Net Income. | Income, Cents per M. |
|---|---|---|---|
| 1922 | 89.04 | $3,652,121.87 | 10.81 |
| 1923 | 87.82 | 4,489,569.50 | 12.03 |
| 1923 (at present prices).. | 85.78 | 5,251,849.53 | 14.07 |

"These facts are presented more for comparative purposes than for anything else, as I have not herein found specifically and individually as to the properties or operations of these companies, for the reason that the actions brought by these other companies on the transfer system are now under review before me and yet to be tried. The facts here found have a comparative bearing, however, upon the reasonableness or unreasonableness of the costs and operations of the plaintiff, as the results of the entire system approximate very closely the costs of the gas furnished by the plaintiff, and tend to confirm the reasonableness of the intercompany charges for the services rendered by the Consolidated Gas Company to affiliated companies and the charges for joint operation of certain properties and facilities. The presentation of the combined revenues and expenses for all of the companies on the transfer system tends also to negative any possible suggestion that any one company is favored, or that any other company is unduly burdened, so as to make the costs of any one company either too high or too low.

"The soundness of considering the costs of the system companies, in connection with the operations of the plaintiff, is borne out by the action of the defendant Public Service Commission, which held that it was proper to treat the question of gas rates in this territory as if it were all served by one system or company, as is substantially the fact in practically everything but corporate entity. If rates were fixed with regard only to each company, it might require different rates for different companies, and result in two rates being in force for companies operating in the same, or parts of the same, territory.

"The defendant Attorney General takes the position that the cost of operation should be determined either by the cost of operation of the gas produced at coal gas house A and water gas house D of the Astoria plant, as was done by Judge Hand, or by the weighted average cost of all gas produced at the four Astoria units. His expert, Mr. Little, presented an estimate of such costs for the nominal year April 1, 1924, to April 1, 1925. Upon cross-examination it developed that Mr. Little was in error in a number of particulars in his estimate of the cost of making coal gas, and he frankly admitted that it would be necessary in any event to increase

his estimated cost at each coal gas plant something over 4 cents per 1,000 cubic feet. His estimated cost of production at the water gas plants had also to be increased somewhat for the same reason.

"It seems to me that the contention of counsel for the Attorney General that the corrected figures presented by Mr. Woods represented Mr. Woods' estimate of the cost for the same period is not quite in accord with the testimony. I understand that Mr. Woods only presented a correction of certain unit figures in Mr. Little's estimate relating to the cost of coking coal, and the sales price received at present for certain residuals and by-products. He did not therein undertake to pass on Mr. Little's estimate of the amounts of material or labor required. In relation to the Astoria coal gas plant there is one fact which largely accounts for the apparent difference in the cost between coal gas houses A and B, and which also goes to Mr. Little's estimate. It was testified, without contradiction, that the operating officials at Astoria have in many ways favored the A house at the expense of the B house, and while it would not make any difference when the entire production is considered, it does if there should be an attempt to select one as a standard by which the cost of coal gas is to be judged.

"The A house has always had the best and specially selected coal furnished it, while B house took the poorer grades, for the reason that the B house, by virtue of mechanical conditions, is able to obtain greater efficiency from the relatively inferior grades of coal than could be secured from the use of that coal in the A house. This diversion of the better grades of coal to the A house enabled the A house to get higher results at a lower apparent cost, because the coal it used produced more gas per ton, and also a greater amount of residuals and by-products for credit against the cost. While the actual cost of this selected coal was higher than the average cost, it was charged on the books against the A house only at the average cost, and the coal used by B house, much of which was of a quality inferior to that provided for A house, was also charged to it at the average cost. If these actual differences were reconciled, there would be little, if any, difference between the operations of the two houses; A house would be higher and B house would be lower.

"Again, in considering whether the cost of gas should be based on the Astoria plant either singly or as a whole, other matters need to be taken account of.' Mr. Little's estimate is based on the making of the entire supply of gas at Astoria. Against this hypothesis is his statement that the Manhattan plants could not and should not be abandoned, and that it would not be desirable or good judgment to have the entire production confined to Astoria, as in the event of any break in the transmission facilities under the river it would cut off the supply of gas to lower Manhattan. He also stated that, if all the gas was manufactured at Astoria, it would be proper to amortize the cost of abandoning the Manhattan plants, which would have to be added to the cost of producing the gas. This Mr. Woods estimated would add 18 cents to the cost of the gas. The testimony also was that the present transmission facilities would be inadequate to care for the amount of gas purposed to be made at Astoria, and such increased facilities would cost at least $6,000,000, on which a return would have to be earned.

"Again, the cost of gas in the holders at Astoria does not in fact represent the cost as against the reported cost of gas manufactured by the Manhattan plants. There is on Manhattan Island a number of large storage holders into which the gas from Astoria as well as the gas from the Manhattan plants is placed. While these holders and the buildings and apparatus connected with them are, as a matter of fact, used to a greater extent for the benefit of the gas made at Astoria than that made on Manhattan Island, these holder costs are not charged against the cost of production at Astoria at all, while the custom is to charge to the cost of production at the Manhattan plants this entire holder cost. In addition there should properly be added to the cost of making the gas at Astoria the cost of transmitting it to these storage holders. There is also a further cost which is carried in the cost of production at the Manhattan plants, and which enters into the return on investment in the Astoria plants; that is, the Manhattan plants carry as an operating expense the bulkhead rentals paid the city of New York, while, as the Astoria Company owns its water frontage at Astoria, these expenses become a matter of return on investment there. The manufacturing plants at Astoria are of both coal and water gas, while the manufacturing plants on Manhattan Island are of water gas only.

"Evidence was given to show that the coal gas plants at Astoria were advantaged by having water gas plants at the same location, whereby the residual coke from the coal gas plant could be used in the water gas plants, with a minimum loss, due to handling and low transportation cost. In like manner, the

water gas plants were advantaged by being able to receive coke from the coal gas plants in good condition for water gas production, and practically no cost for unloading and storing.

"While the evidence showed that the combined coal and water gas production at Astoria was less than the water gas production in the Manhattan plants, it was also shown that the combined coal and water gas plants at Astoria reflected a greater investment per M cubic feet of daily capacity than the investment cost in the water gas plants in Manhattan, and that, when consideration was given to the additional cost of this increased investment in daily plant capacity, there was little or no difference in the production cost between Astoria and the Manhattan plants. All of these matters should be properly taken into account and adjusted.

"In view of the fact that, when everything properly chargeable to the cost of manufacturing is taken into consideration, there is but slight difference in the cost of production between the various manufacturing units of the company on Manhattan and at Astoria, and that the proof is that the plants are operated efficiently and economically, and contain up-to-date machinery and equipment, and their working condition is of a high order, I see no reason for refusing to base the cost of operation on the cost of producing the entire amount of gas sold by the plaintiff, no matter where manufactured.

"Again, assuming that the result claimed by Mr. Little could have been obtained by removing the plant for the manufacture of gas for the complainant entirely to Astoria and abandoning those on Manhattan, it is extremely questionable whether the company would not be permitted to incorporate these expenses in its rate base under the decision of the Supreme Court of the United States in Pacific Gas & Electric Co. v. San Francisco, 265 U. S. 403, 416, 44 S. Ct. 537, 540 (68 L. Ed. 1075). In that case the company had purchased an invention for $40,000. Its use enabled the company to abandon one of its plants and to produce gas at a less cost than previously. The contention was made that it could capitalize the invention only at the actual cost to the company, and must base its return on the remaining portion of its plant, taking into consideration the lowered cost of operation. In overruling this contention the Supreme Court said: .

" 'The installation of the inventions necessitated new outlay of money and abandonment of property theretofore valuable. Both were necessary in order that the cost to manufacture might be reduced. If appellant's permissible profits depend upon the lower costs, and it is denied adequate return upon property which made the reduction possible, or recompense for the obsolescence, successful efforts to improve the service will prove extremely disadvantageous to it.'

"They held that, where a public utility furnishing gas for public use makes obsolete large portions of its equipment by the installation of new inventions, which greatly reduce the cost of production, but cost the utility much less than the demonstrated value, a rate based upon decreased cost of production, without allowing for obsolescence of discarded equipment or the proved value of the invention, takes property without due process of law.

### "Accrued Depreciation.

"As I have already stated, I have made no deduction from or in the amounts found by me for the reproduction cost of the property or its value, for the purposes of this case, for any so-called 'accrued depreciation,' but I have deducted the amounts shown by the uncontroverted evidence to be required to be expended to put the properties used by the plaintiff in a condition equivalent to new. My reasons for these conclusions I have set forth in my opinion in New York & Queens Gas Co. v. Prendergast et al. (D. C.) 1 F. (2d) 351, 365, which has been confirmed by Judge Winslow in the final decree entered by him in that case, as quoted in P. U. R. 1924E, at page 59.

### "Return.

"The investment in or original cost of the property used and useful by the plaintiff in its gas business as of December 31, 1922, was at least the sum of $98,561,127.40, and the net operating revenue for 1922, as I have found it, of not more than $2,346,357.18, was therefore a return of not more than 2.38 per cent. on the investment in the property used by the plaintiff in its gas business as of December 31, 1922. The cost of reproduction of the property used by the plaintiff in its gas business as of December 31, 1922, was at least the sum of $159,710,750.73. The net operating revenue for 1922, as I have hereinbefore found it, after making the various deductions stated, gave therefore a return, on the reproduction cost as of December 31, 1922, of not more than 1.47 per cent. Both of these calculations are based on the quality of gas actually supplied during 1922.

"The investment in or original cost of the property used by the plaintiff in its gas business as of June 1, 1923, was at least the sum of $98,891,803.63, and on December 31, 1923, at least the sum of $98,917,970.64. The net

operating revenue for 1923, as I have hereinbefore found it after making the various deductions (viz. not more than $4,072,181.08), gave a return on the investment cost as of June 1, 1923, and as of December 31, 1923, of not more than 4.11 per cent. The reproduction cost of the property as of June 1, 1923, was at least the sum of $162,559,692.48, and on December 31, 1923, was at least the sum of $155,065,633.85. Such operating revenue gave a return on the reproduction cost as of June 1, 1923, of not more than 2.50 per cent., and as of December 31, 1923, of not more than 2.62 per cent.

"The present value of the property used by the plaintiff in its gas business as of June 1, 1923, was at least $134,101,738.77, and as of December 31, 1923, was at least $129,760,683.77. The return yielded by the 1923 net earnings, as I have found them, figured on the value of the property as of June 1, 1923, therefore would be not more than 3.03 per cent., and as of December 31, 1923, not more than 3.13 per cent.

"The net operating revenue, as I have found it on the basis of 1923 operations and 1924 (May) prices, viz. the sum of not more than $4,515,227.47, would give a return on the investment cost as of June 1, 1923, of not more than 4.56 per cent., and as of December 31, 1923, of not more than 4.56 per cent. Such net revenue would give a return on the reproduction cost as of June 1, 1923, of not more than 2.77 per cent., and as of December 31, 1923, of not more than 2.91 per cent. On the present value of the property used by the plaintiff as of June 1, 1923, such net income would give a return of not more than 3.37 per cent., and on the present value as of December 31, 1923, a return of not more than 3.48 per cent. All of the foregoing computations are based on the quality of gas actually supplied during 1923.

"On the basis of furnishing 650 B.t.u. gas, the operating revenue for 1922 of not more than $1,698,078.18 would give a return on the investment cost as of December 31, 1922, of but 1.72 per cent., and on the reproduction cost of but 1.06 per cent. On such basis, the operating revenue for 1923 of not more than $2,823,586.75 would give a return on the investment cost as of June 1, 1923, of not more than 2.85 per cent., and on the investment cost of December 31, 1923, of not more than 2.85 per cent.; on the reproduction cost as of June 1, 1923, of not more than 1.73 per cent., and on the reproduction cost as of December 31, 1923, of not more than 1.82 per cent. On the same assumption as to compliance with the statutory requirement of 650 B.t.u. gas, the net income based on 1923 operations and 1924 (May) prices, viz. of not more than $3,307,531.22, would give a return on the investment as of June 1, 1923, and as of December 31, 1923, of not more than 3.34 per cent.; on the reproduction value as of June 1, 1923, of not more than 2.03 per cent.; on the reproduction value as of December 31, 1923, of not more than 2.13 per cent.; on the present value as of June 1, 1923, of not more than 2.46 per cent., and as of December 31, 1923, of not more than 2.55 per cent.

"Presented in another form, the investment and return shows as follows:

| | Interest at | | | Return 1922. On Basis of Gas Furnished. | On 650 B.t.u. Basis. |
|---|---|---|---|---|---|
| **Dec. 31, 1922.** | 6% | 7% | 8% | | |
| Investment cost.... $ 98,561,127.40 | $5,913,667.64 | $ 6,899,278.92 | $ 7,884,890.19 | | |
| Reproduction cost.. 159,710,760.73 | 9,582,645.04 | 11,179,752.55 | 12,776,860.06 | $2,346,357.18 | $1,698,078.18 |
| **June 1, 1923.** | | | | Return 1923. | Return 1923. |
| Investment cost.... $ 98,891,803.63 | $5,933,508.22 | $ 6,922,426.25 | $ 7,911,344.29 | $4,072,181.08 | $2,823,586.75 |
| Reproduction cost.. 162,559,692.48 | 9,753,581.55 | 11,379,178.47 | 13,004,775.40 | At Present Prices. | At Present Prices. |
| Present value...... 134,101,738.77 | 8,046,104.33 | 9,387,121.72 | 10,728,139.10 | 4,515,227.47 | 3,307,531.22 |
| **Dec. 31, 1923.** | | | | Return 1923. | |
| Investment cost....$ 98,917,970.64 | $5,935,078.24 | $ 6,924,257.94 | $ 7,913,437.65 | $4,072,181.08 | $2,823,586.75 |
| Reproduction cost. 155,065,633.85 | 9,303,938.03 | 10,854,594.37 | 12,405,250.71 | At Present Prices. | At Present Prices. |
| Present value..... 129,760,683.77 | 7,785,641.03 | 9,083,247.87 | 10,380,854.70 | 4,515,227.47 | 3,307,531.22 |

"From the preceding figures it will be seen that in neither year and under neither the past nor present prices would the company have earned a return of even as much as 6 per cent. on its investment or reproduction cost or present value, even on the quality of gas actually furnished for 1922 and 1923. If the 650 B.t.u. gas had been furnished, assuming it could have been done, the return would have been very considerably less. How much is also shown in the foregoing figures.

"In the face of these results it is impossible to reach a conclusion that an actual test of the statute is necessary to establish its confiscatory character. To require the company to submit to further loss of return as would be necessary if actual test of the rate were to be required would be unfair to the company and impose an unnecessary hardship upon it. The decision does not rest upon such a narrow line between confiscation and nonconfiscation as to bring it within the class of cases where such test has been required.

"Furthermore, it should be borne in mind that one of these defendants, the Public Service Commission of the state of New York, charged with the duty of regulating rates, after a full investigation, within less than a year before the present rate was established by the Legislature, had given the company a rate of approximately $1.15 per 1,000 cubic feet, saying at the same time that they did it, not because they thought it was adequate, but in the hope that there might be reductions in operating costs which would justify it.

"In making such rate, the commission determined the amount of the investment in these gas properties as of June 30, 1922, and apparently used such investment figures as a minimum, saying frankly that, if present wages and prices were taken into account, present reproduction costs and present value would be very much more. So that we have the adjudication of the public body charged with the duty of regulating rates for such companies as complainant saying, after a full investigation, that $1.15 would give an adequate return only on a 'rate base' equivalent to the actual, unimpaired investment in the property used in the gas business, and that a $1.15 rate would do this only if the company were able to reduce operating expenses in a substantial manner, which it did not and could not do. While, of course, this action of the commission is not controlling on the court, yet it is entitled to great weight in considering the necessity of a test period,

and, taken together with the other facts in the case, would seem to render further test of the statute unnecessary.

## "Price Level.

"During and after the war there was for a considerable time a tendency to regard the prices then prevailing as temporary and abnormal. That was a defense urged by public authorities in resisting the demand for increased rates by public utility companies, and courts and masters showed an uncertainty and hesitation on the subject. This claim was still urged at the time of the previous trial of these rate cases, although found against by the master and the court.

"Over six years have now elapsed since the close of the war, and it may fairly be found, I think, that the present level of prices is, and for a long time to come will be, the normal one. It is the generally accepted fact, and it was so proven before me, that so far as wages are concerned—and they make up one of the largest items in the cost of manufacturing and distributing gas—the level is higher than it was at the time of the previous trial, and shows no signs of decreasing. There have been some changes in the price of coal and oil, but these commodities fluctuate in accordance with varying conditions, being higher one year and lower another, but on a general level greatly above former years.

"In the present trial the defendants have not urged this defense, and their expert, in making his estimate for the future, took substantially the figures shown by the company's books to have been incurred in 1923. I see no reason to believe that there is anything abnormal in the prices during that year, or that the future will bring any substantial reduction. If it does, there is always the right of the Public Service Commission to investigate, and, on proper cause shown, to order the company to give the public the benefit of such reductions.

## "Rate of Return.

"The plaintiff is entitled to a fair and reasonable return upon the present value of its property used and useful in the service of its gas consumers. Bluefield Waterworks Co. Case, supra; Southwestern Bell Telephone Case, supra, and cases cited. If the investors were going to buy or build a property like that of the complainant, what amount would they feel that the property should earn in order to induce them to invest their money in the purchase or construction of such a property? Taking into consideration

other classes of investment in this locality, with the comparative risks and return thereon, the rate of return generally required to secure proper credit for borrowing money and financing its operations, what should a utility company subject to state regulation be permitted to earn, in order that it might compete successfully with other businesses and be on a parity with them?

"There seems to be some misunderstanding on the part of the defendant Attorney General as to the meaning of the rate of return referred to by the court. His apparent contention is that it means the amount the plaintiff should pay in the way of interest on bonds and dividends on stock, and on that theory he offered proof as to loans made to and by various corporations and the rate at which they were made, and proof as to the selling price of various stocks and bonds and the yield thereon. My understanding is that it relates entirely to the return the corporation itself must earn over and above the cost of operation and taxes before it makes any distribution to its stockholders or bondholders. A corporation does not ordinarily expect to pay out all its earnings in the shape of dividends, and, if it is successfully operated, certainly it would not be obliged to pay them out for interest on its obligations. Good business management requires that disbursements of this character should absorb only a portion of its earnings, and some part should be carried to surplus account. It is these earnings, and not the amount disbursed to bond or stockholders, with which the courts are concerned in passing upon the confiscatory character of the rate. Just what this rate should be is not a fixed and established matter, applicable alike to all classes of investment and all sections. Business men discriminate between investment, and rates of interest and return vary. As was said by the statutory court in New York Telephone Co. v. Public Service Commission: 'The rate of return on property is a matter of custom, and custom is fundamentally opinion. Admitting it is and has been customary to allow as a reasonable rate of return for a regulated business like this one 8 per cent., the justification for the custom is the habit of business men, and a departure therefrom is not right because a court or commission prefers a lower rate. * * * The question always raised in rate cases is this: What rate of return, with due regard to certainty and security, will attract the intelligent investor?'

"On this subject the plaintiff introduced the evidence of two witnesses, Mr. Allison, consulting engineer and adviser of banks and investors in public utility business and management, and Mr. Hoyt, vice president in charge of public utility investments of the National City Company of this city. Their familiarity and qualifications for testifying on the subject were proven. Both had large experience with the subject, and both testified that the plaintiff should receive a return of 8 per cent. on the present cost to build or buy the property; that this amount would be required, and even more, to interest capital in a public utility such as the plaintiff.

"While, of course, there is no guaranty on the part of the public authorities or any one else that a public utility should be successful, yet if it could earn a proper return on the value of its property in the business, without regulations or statutes preventing them so doing, then such regulations or statutes operate to deprive the company of its property without justification and are confiscatory. The defendants claim that 6 per cent. return would be sufficient in this case to prevent the statute being obnoxious to the constitutional provision, mainly because the Supreme Court, in Willcox v. Consolidated, supra, held in 1906 that such a return was not confiscatory on the facts in that case, although counsel for the Public Service Commission contended that this rate of return was also within the decision in Newton v. Consolidated Gas Co., 258 U. S. 165, 42 S. Ct. 264, 66 L. Ed. 538, and other cases.

"With the decreased value of the dollar and the changing conditions in the business and financial world, due to the World War, the fact that a return of 6 per cent. in 1906 was held not confiscatory is not authority for holding that at the present time and under present conditions it would still apply. While it is true that in the years past various rates, ranging from 6 per cent. in the first Consolidated Gas Case to 8 per cent. in the latest cases, have been used to determine the confiscatory character of the return, the more recent cases, and those decided under present conditions, have uniformly tended to a higher rate. Bluefield Co. v. Public Service Commission, supra; Minneapolis v. Rand (C. C. A.) 285 F. 818, 830; Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678; Bronx Gas & Electric Co. v. Public Service Commission, 190 App. Div. 13, 180 N. Y. S. 38. I find that 8 per cent. is a rate customarily required in the locality to be earned on the present value of the property of a regulated public utility, and that the plaintiff should be permitted to earn at least this amount.

"Deficiency in Earnings.

"Plaintiff sought to introduce evidence as to loss of earnings claimed to have been incurred by it during the period when it was compelled to operate under a rate established by authority of the Legislature or public authorities, although resisting the same. That there was a loss seems unquestioned, but as to the amount I did not take proof, as I thought and still think the Supreme Court of the United States has decided adversely to the plaintiff's position. Georgia Railway & Power Co. v. Railway Commissioners, supra; Galveston Electric Co. v. Galveston, supra; Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371.

"Judge Hand's Opinion.

"At the time of the passage of the act under consideration statements were made, which undoubtedly greatly influenced legislative action, to the effect that Judge Hand's opinion furnished good and sufficient reasons for believing that the plaintiff and other gas companies in the city of New York could furnish gas at the $1 rate, and receive a reasonable return on the value of their property used in the gas business. It is now insisted by the defendant Attorney General that that opinion is controlling in the present case, and that the special master is bound by his opinion as to the inclusion and exclusion of items from the rate base and the manner in which the cost of making of gas is to be computed.

"Inasmuch as the defendant Attorney General claims that under the method laid down by Judge Hand the plaintiff would receive a return of over 7 per cent. on its rate basis as so found, it becomes important to consider the effect of that decision, the circumstances under which it was rendered, and what Judge Hand intended thereby. The full opinion is to be found in Consolidated Gas Co. v. Newton (D. C.) 267 F. 231. In that case there had been a bitter contest of practically every fact found by the special master, each side introducing evidence to support the position for which they contended. The cost of making gas at Astoria was proven by defendants as part of their case. The value of the real estate was proven by showing the assessed value as fixed by the deputy tax commissioners of the city of New York. The value of the remaining property was shown by introducing the inventories and appraisals of the property in the 1906 suit, the unit prices applied to the properties inventoried, and the extent to which such properties were then in existence and in use by the company. Proof was offered of the then unit prices for labor and material. On that basis the master was asked to find that the then reproduction cost of the property used in 1906 and still in use was at least as much as it was then proven to be, and that the property added since 1906 was worth at least as much as it cost when erected and installed. The master based his conclusion as to the value of the property on the actual investment therein, proof of which was offered first by the defendants, and in rebuttal by the plaintiff.

"In his opinion, the special master in that case said that the evidence showed that the costs of operation had varied in the different plants of the company, and sometimes in the same plant on different days. Having referred to the varying costs as shown by the different plants, he proceeded: 'Having in mind that the plaintiff must prove its case beyond any reasonable doubt, I reached the conclusion that the safest basis on which to work was the actual result of operations in the Astoria plant; * * * that plant being the most efficient manufacturing plant, with modern labor-saving devices.' He accepted the defendant's contention as to the investment cost being the proper manner of establishing the rate base. He found the rate base in that way, and made it up very largely as contended for by the defendants. He found the cost of operations as advocated by them, and still found that the rate of return received was confiscatory.

"When the report came up for confirmation, Judge Hand was even more drastic in his rulings. In dividing certain joint office expenses, he said: 'I shall adopt it, but only because I am taking all doubts against the plaintiff.' Again, in excluding the Fourteenth and Forty-Second street plants, he said it was done 'in accordance with my plan of resolving all doubts against the plaintiff.' He calculated the value of the plants on the basis of cost, 'not in any sense because I think cost the test; only because it is clear that at present anyway an estimate based upon cost is a most conservative one.' In fixing the amount of working capital he said: 'For working capital I take $2,000,000, not because I mean to fix any such sum, but as a conservative compromise between the plaintiff's figure of $3,800,000 and Maltbie's of $1,480,000.' After fixing the amount of the investment he said: 'It is more than probable that the plaintiff's whole investment is therefore properly valued at $130,000,000 at

present prices or twice what I have valued it.'

"In concluding that, even under his policy as above announced, the rate was confiscatory, he said: 'In the figures I have used I think it clear that everything has been pared down unsparingly, and I take this occasion to say what I have already alluded to more than once already. It would be most unfair to accept any of these figures in fixing a rate. The attitude of a court is very different; it does not try to do justice between the company and the public, but only to see whether the actual rate can by any possibility still be a fair rate. In so doing it must take everything in favor of the rate. It would be the height of injustice if, in view of that attitude, its conclusions so reached were treated as a fair basis for fixing a new rate. Furthermore, I have not hesitated to cut more ruthlessly in this case than if the result had been closer.'

"It is now sought to uphold the $1 rate for 650 B.t.u. gas, in 1923 and 1924, by insisting that Judge Hand's discussion, made on the report and evidence then before him as to 1917–1919 conditions, and made for the purposes and on the minimum basis above indicated, bind now the special master in this case, wherein different facts are presented and different evidence produced by both plaintiff and defendants. A careful reading of the opinion shows clearly that Judge Hand, as he repeatedly said, was not attempting to determine the facts on the conflicting evidence presented, after a consideration of the weight to be given the testimony relating thereto produced by plaintiff and defendant, but was testing whether, even under the claims of the defendants and making every allowance in their favor, both as to rate base and cost of operations, the statute could be sustained, and he found against it even under such theory.

"When Judge Hand, in his opinion of August 5, 1920, fixed a rate for the plaintiff pending appeal by the defendants to the United States Supreme Court in that case, he disregarded the basis which he had preliminarily used for rigorously testing the unconstitutionality of the statute and prescribed a rate of $1.20 per 1,000 cubic feet, which rate the United States Supreme Court subsequently pronounced 'a limitation in favor of the consumers.' In February of 1921, upon the expiration of the six-month period for which he had limited the Consolidated Gas Company to a rate of $1.20, he removed this restriction, despite the pleas of the defendant public authorities that the $1.20 rate should be continued until the United States Supreme Court had decided their appeal.

"Under the heading, 'Difference between Present and Former Suits,' I have shown the many and great variations between the issues presented then and now, and must conclude that, while the decree and findings in the prior suit should be given their full force and effect, Judge Hand's opinion and discussion is not and was not intended to have any such force or effect as defendants contend. I think Judge Hand, in stating that 'the attitude of a court is very different; it does not try to do justice between the company and the public,' was rather more radical than he could have intended, assuming that it be construed as meaning that a decision as to the confiscatory character of the rate is not to be based on a fair and judicial consideration of the weight to be given the evidence produced on both sides. Of course, if, even under the defendants' contention, the rate could not be sustained, as in the previous case, it would be unimportant; but where the question is closer, and the confiscatory character of the rate depends upon the rate base and the cost of operation, I think the decision of the higher courts clearly entitle the plaintiff as well as the defendants to have their evidence weighed under the ordinary rules, and a determination made after such consideration.

"A careful reading of Judge Hand's opinion makes it clear that he based it entirely upon the investment cost of the company's property (except as to land, which was taken at assessed value), and that he entirely disregarded present value in his findings, as the basis above indicated was entirely sufficient to demonstrate his decision as to the confiscatory character of the 80-cent rate. Although he argued persuasively that present reproduction cost must be accepted as the economic measure of present value, and although he stated in his opinion, as hereinbefore quoted, that the value of the plaintiff's investment at then present prices was $115,-000,000 or twice what he had taken it at, he did not give this fact any consideration in his finding of a 'rate base' for the purposes of that determination. This use of a minimum basis seems to be in conflict with the subsequently decided cases in the Supreme Court of the United States of Southwestern Bell Telephone Co., supra, and Bluefield Waterworks, supra, especially the latter, and other cases requiring the return to be on present value.

"The 650 B.T.U. Standard.

"The provision of chapter 899 of the Laws of 1923 which required the company to furnish in the territory affected gas of a standard of not less than 650 B.t.u. per cubic foot, measured under normal conditions of temperature and atmospheric pressure, is attacked on the ground that it is in violation of the Fourteenth Amendment of the Constitution of the United States, in that it deprives the plaintiff of its property without due process of law, and denies to it the equal protection of the law. It is claimed that it is commercially and physically impossible for the company to comply with it; that it would be wasteful, uneconomical, would give poor service, at a much higher cost, and would be dangerous to life and property. It is also claimed that this provision of the statute is inseparable from that fixing the price to be charged, and, if that is confiscatory, the standard provision must fall with it.

"As to this last contention, I was of the opinion that it was separable from the price fixing provision of the statute, and so held in the Case of the New York & Queens Gas Co. and in the Case of Bronx Gas & Electric Co. The District Court, in passing upon the special master's report in those cases, was of a different opinion, and I therefore must and do regard it as the law of this case that the rate and standard provision is not separable.

"As to the other contentions, they are supported even more strongly by the testimony of Mr. Little, the defendant expert engineer witness, than by that of the plaintiff's witnesses. Mr. Little was most emphatic in his condemnation of this provision of the statute. He said: 'They cannot make gas that will deliver to every consumer a minimum of 650 B.t.u., whether they make it with water gas, or coal gas, or a mixture.' He stated that a coal gas plant could not operate at all on that standard. He further testified that, if gas of such a standard was furnished, it would be uneconomical, that the consumers would not get as much for their money, and that it would be hazardous to life and property in so doing. He also stated that the cost of the additional gas oil required would be at least as much as Mr. Wood's estimate, which was that it would increase the cost of making such standard of gas by 4.95 cents per 1,000 cubic feet of gas made. A large amount of testimony was given on behalf of the plaintiff to the same effect, and I think it can be safely found that the enforcement of the 650 B.t.u. standard would be in effect a confiscation of the coal gas plants of the company, and render it impossible to operate them under such standard, and would render it unsafe and hazardous to life and property to operate even the water gas plants thereunder, and would be uneconomical, wasteful, and give very poor results to the consumers, as well as increasing the cost of making such gas some 4.95 cents per 1,000 cubic feet of gas made.

"The statute also provides that it should go into effect immediately, while the uncontradicted testimony is that it would require at least from 6 to 9 months for the plaintiff to change the consumers' apparatus, so as to be regulated for gas of this standard. The putting into effect immediately of the statutory provision would be unconstitutional, as depriving the company of its right to a safe and adequate review of the legality of the statute. Wadley Southern Railway Co. v. Georgia, 235 U. S. 651, 35 S. Ct. 214, 59 L. Ed. 405; Bronx Gas & Electric Co. v. Public Service Commission, 190 App. Div. 13, 23-25, 180 N. Y. S. 38. The company therefore in any event should have an opportunity to a judicial review of the statute and adequate time to regulate the necessary apparatus to conform thereto, if it is compelled to comply with such a statute.

"The Statute as Affecting the Order of August 30, 1922, of the Public Service Commission as Accepted and Put into Effect by the Plaintiff.

"By an order made by the Public Service Commission of the state of New York on August 30, 1922, effective October 1, 1922, the said commission, as then authorized by statute to do, fixed rates to be charged by plaintiff to its consumers (other than the city of New York), ranging from $1.15 per 1,000 cubic feet for the first 100,000 cubic feet of gas per meter per month to 95 cents per 1,000 cubic feet for over 1,000,000 cubic feet per meter per month. By its terms such order was to take effect on October 1, 1922, and continue in force until September 30, 1923, and thereafter until the commission should otherwise order and require, the plaintiff to notify the commission within 10 days whether the terms and conditions of the order would be accepted and obeyed. A certified copy of the order was served on the plaintiff, and on or about September 13, 1922, the plaintiff notified the commission in writing that such order was accepted by the plaintiff and would be obeyed.

"Simultaneously with the making of the above-mentioned order, the commission made and caused to be served on the plaintiff an order fixing a standard of gas to be furnish-

ed to its consumers of not less than 537 B.t.u. per cubic foot on a monthly average, and not less than 525 B.t.u. per cubic foot on a daily average for any 3 consecutive days in any month. This order was also to be effective October 1, 1922, and continue in effect until changed, modified, or abrogated by the commission. The plaintiff was required to notify such commission, within 10 days after service of a copy of such order, whether it was accepted and would be obeyed. On or about the 12th day of September, 1922, the plaintiff notified the commission that this order would be accepted and obeyed.

"Therefore, and in pursuance of the said orders of the commission in cases Nos. 79 and 108, the plaintiff duly filed with said commission and duly posted and published, as required by law and the order of the said commission, its tariff schedules setting forth rates, charges, and classifications to be in force for the service to be furnished by the plaintiff in accordance with the said orders of the said commission of August 30, 1922, and the plaintiff's filed acceptance of such orders, and the plaintiff has complied in all respects with the terms, provisions, and conditions of the said orders.

"Thereafter plaintiff, as required to do in order to comply with such order as to the standard of gas to be furnished, changed the apparatus of its consumers to enable them to properly burn gas of that standard to be furnished under such order, a large force of men being employed for that purpose for a period of approximately 9 months and at an expense of many thousands of dollars in so doing. The Public Service Commission has never, since August 30, 1922, changed, modified, or abrogated its said order of that date, either as to the price or quality of gas to be furnished to plaintiff's consumers.

"On June 2, 1923, chapter 899 of the Laws of 1923 became effective, providing that the rate to be charged should be $1 per 1,000 cubic feet of gas furnished, and that the thermal content thereof should be 650 B.t.u. Thus within the period fixed in the commission's order of August 30, 1922, during which the company was to be permitted to charge a rate approximating $1.15 per 1,000 cubic feet for the bulk of its consumers for gas of a thermal content of not less than 537 B.t.u., the legislative act changing both provisions became effective.

"The plaintiff claims that this action of the Legislature was in violation of section 10 of article 1 of the Constitution of the United States, in that it impairs the obligation of the plaintiff's contract with the state of New York. In the previous cases before me I did not pass upon this question, as there were other grounds amply sufficient to justify declaring the statute confiscatory, and I felt that, if this contention was to be made a ground for declaring the statute unconstitutional, it might better be done in the first instance by the District Court.

"Judge Winslow, in passing upon the special master's report in the case of New York & Queens Gas Co. v. Prendergast, 1 F.(2d) 351, in the District Court, has now upheld this contention of the plaintiff, and in a well-considered opinion gives the reasons and authorities therefor. It is not necessary for me to say anything further than that I regard his opinion as being the law of the case on that subject, and am bound to and do follow it.

"Conclusion.

"The plaintiff also urged that the statute imposed unlawful and unreasonable discriminations against it, which rendered it obnoxious to various provisions of the Constitution, and therefore unlawful and void. The grounds upon which this contention rests are all in the record, and I have felt it unnecessary to pass upon them, as they involve no finding of fact, and for that reason what I might say on the subject would be of but slight assistance, possibly, to the court. The grounds of my decision have been fully stated, and the facts from which the court may draw its conclusions are set forth at length. The complicated character of the relations between the companies, their methods of business, and the importance of the questions raised are the only justification for the extent of the opinion and the length of the findings.

"The questions have been argued very fully before me, and, while a decision might be based on legal grounds which would obviate the necessity of findings as to the costs of operation and as to the present value of the useful property, I have felt it my duty under the direction of the court to pass upon and present the facts in regard to those questions, in order that the entire situation might be before the court and its decision might be based on such grounds as seem to it proper. The evidence, which was taken at great length, has been reviewed by me in the preparation of this opinion and report, and the exhibits in the case and the arguments of counsel given careful consideration.

"On the facts and the law as I understand the decisions of the courts, I have rendered

this opinion and have made the findings hereto attached."

Shearman & Sterling, of New York City (John A. Garver, William L. Ransom, Jacob H. Goetz, and Sanford H. E. Freund, all of New York City, of counsel), for plaintiff.

Charles G. Blakeslee, of Binghamton, N. Y. (Harry Myron Chamberlain and Charles F. Murphy, both of New York City, of counsel), for defendants Prendergast, Pooley, Van Voorhis, Semple, and Van Namee.

John Holley Clark, Jr., of New York City (Charles E. Buchner, of New York City, of counsel), for defendant Ottinger.

WINSLOW, District Judge. This is an action in equity, the object of which is to have declared unconstitutional, as confiscatory and void, chapter 899 of the Laws of 1923, state of New York, which prescribes a maximum rate in cities of 1,000,000 or more of $1 per 1,000 cubic feet of gas of not less than 650 British thermal units per cubic foot, and and for an injunction restraining the defendants from enforcing or attempting to enforce the provisions of said act. New York City is the only city of the state of over 1,000,000.

The special statutory court in this district composed of Rogers and Hough, Circuit Judges, and Bondy, District Judge, granted a preliminary injunction on July 6, 1923, as to this plaintiff and all other gas companies in the Southern district of New York, enjoining the enforcement of the statute under attack, on condition that the gas companies continue in effect, pendente lite, the rates theretofore fixed by the Public Service Commission, and on the further condition that they continue to furnish gas of the thermal content which the commission had authorized as the basis for such rates.

The defendants are members of the Public Service Commission of the state of New York, and the Attorney General of the state of New York.

The matter was referred by me to Hon. James G. Graham, as special master, by an order dated July 24, 1923, and later amended August 7, 1923, which order directed the special master to hear the evidence, make all computations, find the facts, and report with recommendations. The present motion brings on for final hearing in this court the report herein filed by the special master. This report, which is in full compliance with the direction of the court in appointing the special master, is most exhaustive on the questions of law and fact.

The report recommends the entry of a final decree in favor of the plaintiff. The plaintiff, however, prays that certain exceptions filed by it be sustained by this court, and that the report be modified accordingly, and then confirmed, as modified, and that a final decree be made in favor of the plaintiff.

The defendant Attorney General filed numerous exceptions to the findings in portions of the report, and now prays that the report be overruled, and that the constitutionality of the statute in question be sustained. The defendant Public Service Commission, while arguing in favor of the constitutionality of the statute, contends, however, that, if the court sustain the master's findings of fact as to operating costs and original cost of the property, it is not necessary or proper for the court to inquire further as to the value of the property for rate-making purposes, or the rate of return which the plaintiff might be entitled to in a rate case.

The act in question became effective June 2, 1923, and provided as follows:

"Sec. 67–a. *Charge for Gas in Cities of One Million or More.* A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The Public Service Commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum."

This statute has been under consideration by this court in New York & Queens Gas Co. v. Prendergast, 1 F.(2d) 351, and 371, and Bronx Gas & Electric Co. v. Prendergast, 1 F.(2d) 385.

By section 72 of the Public Service Commission Law, chapter 480 of the Laws of 1910 (N. Y.), as amended by chapter 134, § 49, of the Laws of 1921, the Legislature empowered the commission to fix rates to be charged by a gas corporation, and also to establish a period, not exceeding three years, during which the rate so fixed should continue in effect, and thereafter until the commission should fix a different rate. Subdivision 3 of section 66 of the same law authorized the commission to fix a standard of quality of gas to be furnished to consumers.

The Public Service Commission, pursuant to these provisions of the Public Service Commission Law, by orders adopted by it on or about August 30, 1922, effective October 1, 1922, provided for a rate applicable to the plaintiff of $1.15 per 1,000 cubic feet (except as to consumers of very large quantities of gas) of a total heating value of not less than 537 British thermal units (monthly average) per cubic foot. This rate and thermal unit, it was provided by the orders, were to continue for one year from October 1, 1922. The rate was accepted by the plaintiff herein, and the various requirements of the statute complied with. Large sums of money were expended by the gas company in adjusting its appliances and those of its customers to conform to the thermal unit prescribed. Before the expiration of the year during which the rate so prescribed by the Public Service Commission was in effect, the statute now under attack was enacted.

In the prior cases under consideration (New York & Queens Gas Co. v. Prendergast and Bronx Gas & Elec. Co. v. Prendergast, supra), the question of rates was of secondary importance, for the reason that the facts were conclusive that the cost of production and distribution alone in those cases exceeded the rate fixed by the statute, without providing any reasonable return upon the investment.

[1] In pursuing his inquiry in the instant case as to whether or not the statute under consideration is confiscatory, the learned special master considered the case from three possible viewpoints, and upon all the evidence arrived at (1) investment cost; (2) reproduction cost; and (3) present value of the property of the plaintiff, for the year ending December 31, 1922, and similarly for the period to June 1, 1923, and to December 31, 1923. For the stated periods, at past or present prices, whatever base be taken, whether investment cost, reproduction cost, or present value, the return as ascertained by the special master for gas of the quality actually furnished is very much less than 6 per cent. If the proposed 650 B.t.u. gas had been furnished, assuming that could have been done, the return would have been still lower. The master's conclusion is that an actual test of the statute, to demonstrate its confiscatory character, is unnecessary. I believe that conclusion is amply justified by the record. There is no narrow line in this case between confiscation and nonconfiscation. I concur in the master's conclusion that the enforcement of the proposed $1 rate, if applied to actual operation of the plaintiff during the periods under consideration, would be equivalent to the confiscation of its property, whatever rate base be the starting point.

[2] In arriving at the several bases upon which the rate of return may be computed, the master has resolved very many questions against the plaintiff, which the court deems should have been resolved in its favor. In determining operating expenses, items open to controversy are eliminated, and operating expense is reduced to its lowest terms. It would have been proper, for illustration, to include the cost of constantly recurring rate litigation in the year when incurred, instead of eliminating those expenses altogether. But, in view of the court's conclusion that the Act is unconstitutional, confiscatory, and void, even with these debatable items decided by the master against the plaintiff, it is not necessary for this court to pass on these specific matters.

[3-5] It may not be amiss, however, to make some observations concerning this and other litigation of like character. At the outset, it must be emphasized that it is the *property*, and not the *original cost*, which the owner may not be deprived of without due process. The present value of the property must therefore, be the goal of investigation, and present value must be expressed in terms of present money. While reproduction cost, less depreciation (if proven), is the dominant element in determining a rate base, it is not, of course, exclusive of other elements. Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Commission et al. (D. C.) 292 F. 139; N. Y. Tel. Co. v. Prendergast, (D. C. S. D. N. Y.) July 26, 1924, 300 F. 822.

[6] It is also the court's conclusion that at the present time a reasonable rate of return, according to well-recognized custom in a regulated business like this, is not less than 8 per cent. The rate of return on the property is not to be confounded with the amount of dividends that a corporation might pay on its capital stock. Indeed, according to all successful business experience, a corporation paying out in dividends all or even the major part of its net earnings is courting speedy disaster. "The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." Bluefield Waterworks & Imp. Co. v. Public Service Comm. of West Va.,

262 U. S. 679, 692, 693, 43 S. Ct. 675, 679 (67 L. Ed. 1176). For the reasons stated, it is unnecessary for the court to further ana‑ lyze the elements considered in the several bases.

[7] This court is further of the opinion, as heretofore expressed in N. Y. & Queens Gas Co. v. Prendergast and Bronx Gas & Elec. Co. v. Prendergast, supra, that the rate and the calorific standard prescribed by the statute under consideration are inseparable. I have expressed my views, also, in those cases as to the contractual obligation result‑ ing from the rate established by the Public Service Commission for the period of one year and until thereafter modified. I see no reason in the instant case for arriving at a different conclusion. The power of the Leg‑ islature to change the rate after the expira‑ tion of the "period of repose," subject to constitutional restriction, is, of course, con‑ ceded as elementary.

The referee's report will be confirmed. The parties may submit a proposed decree and findings in the form of a final decree in accordance with the views herein expressed.